**GREENCASTLE WATER WORKS CO. v.
PUBLIC SERVICE COMMISSION OF
INDIANA et al.**

District Court, S. D. Indiana, Indianapolis Division.   March 18, 1929.

No. 1161.

Clyde H. Jones and D. M. Patrick, both of Indianapolis, Ind., for plaintiff.

The Attorney General for the State of Indiana, for defendants.

Before ALSCHULER, Circuit Judge, and BALTZELL and SLICK, District Judges.

BALTZELL, District Judge. The plaintiff is a corporation organized and existing by virtue of the laws of the state of Indiana, with its principal office in the city of Greencastle, Putnam county, Ind. It was organized and is now doing business as a public utility in the state of Indiana. It is the owner of the waterworks plant and system in Greencastle, and is now, and has been continuously for almost 40 years, furnishing water to its subscribers in that city.

The defendant the Public Service Commission of Indiana was created by virtue of a statute of the state of Indiana. It is given authority to regulate public utilities and to determine what are just and reasonable rates and charges which a utility may collect from its subscribers.

In addition to the Public Service Commission of Indiana, there are made defendants to this action the individual members of said Commission, and also Arthur L. Gilliom, Attorney General of the State of Indiana, and Ed Jackson, Governor of the State of Indiana.

On the 19th day of July, 1927, there was filed with the Public Service Commission of Indiana, by the plaintiff, a petition praying that said Commission make an order allowing the plaintiff an increase in rates. A hearing was had by the Commission on said petition, and under date of October 6, 1928, order was entered in said cause fixing the rates and charges which the plaintiff should be entitled to collect from its subscribers. The total revenue which may be collected by the plaintiff, under the schedule of rates, as fixed by such order, is in excess of those received by it under the present rates, by approximately $2,000.

The plaintiff, being dissatisfied with the fair value of its property, and the schedule of rates and charges, as fixed by the defendant Commission in its order of October 6, 1928, brought this action seeking to enjoin the defendants from enforcing such order. It is alleged that said order is confiscatory of the plaintiff's property, used and useful, and, if put into effect, will deprive plaintiff of its property without due process of law, and will also deny plaintiff the equal protection of the laws, in violation of its rights under the Fourteenth Amendment to the Constitution of the United States. Prayer for an interlocutory injunction, pending final hearing, is contained in the bill, thereby making it mandatory that a three-judge court be organized for the purpose of hearing and determining said cause. Section 266, Judicial Code; United States Code Annotated, title 28, § 380; Smith et al. v. Wilson et al., 273 U. S. 388, 47 S. Ct. 385, 71 L. Ed. 699.

The defendants filed an answer, in which it is alleged that the value of the property, as found by the Commission, is the fair value of such property; that the rates, as fixed by the Commission, are fair and reasonable, and adequate to yield a reasonable return upon the value of the property, as found by the Commission. After a hearing by the court, an interlocutory injunction was denied.

This court is called upon to determine whether or not the order of the defendant Commission, fixing the value of plaintiff's property, and the rates and charges to be collected thereunder, is such that the Commission, in the exercise of its functions, clearly violated the Federal Constitution, in that it fixed such valuation and rates so low that it cannot be said that the plaintiff realizes a fair return upon the value of its property. In fixing utility rates, the defendant Commission exercises a legislative function, and not a judicial power. Therefore this court will not review the actions of the Commission for the purpose of substituting its judgment for that of the Commission. But the function of this court is to determine whether or not the rates as fixed by the Commission yield such a small return upon the value of the property as to amount to confiscation and thereby violate the Constitution of the United States. In other words, the question involved is whether, in prescribing a schedule of rates to be collected by the plaintiff, taken as a whole, the defendant Commission has superseded the constitutional limit by making the rates confiscatory. The Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571,

47 L. Ed. 892; San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 S. Ct. 804, 43 L. Ed. 1154.

The plaintiff company was organized and begun operation in the year 1889 with a bond issue of $150,000. It was operated from the date of its organization under a franchise issued by the city of Greencastle until the passage of the law providing for the creation of the Public Service Commission of Indiana in 1913.

Immediately following the enactment of the statute providing for a Public Service Commission, the plaintiff surrendered its franchise theretofore held by it. Since that time it has been operating under an indeterminate permit, subject to the provisions of the laws of the state of Indiana governing public utilities. It has been collecting the rates and charges from its subscribers, as fixed by the defendant Commission.

On November 20, 1913, the plaintiff filed its application with the defendant Commission in cause No. 375 for authority to increase its rates for service. After a hearing by the Commission, its rates were increased, the fair cash value of its property at that time being fixed at $150,000 by the Commission. Under this order, the plaintiff rendered service until July 17, 1918. On May 18, 1918, the plaintiff filed its application with the defendant Commission in cause No. 3865 for an increase in rates over those fixed in November, 1913. After a hearing by the defendant Commission, an increase in rates was granted for a period of two years. The plaintiff accepted the increased rates and operated thereunder. On May 15, 1920, the plaintiff filed with the defendant Commission in cause No. 5406 a schedule of rates for its approval, which schedule of rates was higher than the rates then charged by it. The defendant Commission, after a hearing, made an order increasing the rates and fixing the fair value of the property of the plaintiff at $170,000. On August 8, 1922, the plaintiff filed its petition with the defendant Commission in cause No. 6724, asking authority of the Commission to reduce the charge for fire hydrants from $72.50 per annum to $65 per annum. The Commission, after a hearing on the petition, granted same and entered an order reducing the charge for fire hydrants from $72.50 per annum to $65 per annum. Under the orders thus fixed by the defendant Commission on May 15, 1920, and August 8, 1922, respectively, the plaintiff continued to furnish service, and is so furnishing service at this time. The plaintiff refused to accept the schedule of rates as prescribed by the order of the Commission under date of October 6, 1928.

The present owners of the common stock of plaintiff purchased the same during the month of June, 1927, for the sum of $100,000. Shortly following the purchase of the stock by the present owners, a petition for an increase in rates was filed by the plaintiff with the defendant Commission. The defendant Commission entered an order under date of October 6, 1928, fixing the fair value of the property of the plaintiff, both used and useful, in the sum of $300,000. A schedule of rates was provided in the order, which, in the opinion of the Commission, will yield a reasonable return upon the value so found by it.

It is the contention of the plaintiff in this action that the fair value of its property, as found by the Commission, is less than the fair value of the property. It is further contended that even though the value, as fixed by the Commission, is a fair value, the rates provided in the order of the Commission are insufficient to yield a reasonable return thereon.

It is well settled that the validity of rates fixed for public utilities depends upon the property value as of the effective date of the order, and for a reasonable time thereafter. The values of such properties do not vary with the minor fluctuations of the prices of material and labor required to reproduce such properties, but they are affected by, and generally follow, the permanent levels and trends of such prices. McCardle et al. v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316.

Therefore, the first question for this court to determine is whether or not the value of the plaintiff's property, as fixed by the Commission, is a fair value as of the date of the hearing, and for a reasonable time thereafter. If such question is answered in the affirmative, then we must next consider whether or not the rates, as fixed by the order of the Commission, will yield a reasonable return upon such valuation. The question of whether or not the order of the Commission is confiscatory depends upon the net income to be received by plaintiff, under the schedule of rates as provided in said order. If the schedule of rates provides a reasonable return upon the fair value of the plaintiff's property, then the order must stand, even though the value, as fixed by the Commission, in its order, is too low.

Prior to the hearing by the defendant Commission upon the petition of plaintiff for an increase in rates, the plaintiff had an ap-

praisal of its property made by Stone & Webster, a reputable engineering firm. The appraisal prepared by such engineering firm was introduced in evidence at the hearing before the Commission, and also upon the trial of this cause. Mr. William V. Burnell, representing Stone & Webster, testified, upon the trial of this cause, that he made a personal inspection of the physical property of the plaintiff, and fixed the value of such property, as contained in the appraisal, from such inspection. Depreciation was based upon the physical condition of the various units comprising such property. Some of the units were in better condition than others, and therefore such units were given, by such engineering firm, a less percentage of depreciation. The cost of reproduction, new, as of May 1, 1927, was found by Stone & Webster to be $663,147. After making deductions for depreciation, the value was found to be $594,200. The depreciation fixed by Stone & Webster was $68,947, which, in our opinion, was much less than the actual depreciation, as shown by the evidence. The value of the land being only $4,200 does not seriously enter into the consideration of this case.

The appraisal of Stone & Webster contained detailed statements explaining the manner in which the value of the property in question was determined. Consideration was given to the cost of material, labor, excavation, amount of rock encountered, etc. Structural overhead charges were estimated, an amount was set aside for working capital, and the going value of the plant was fixed.

In this appraisal, there are several important items of construction costs, which, as shown by the evidence, are excessive. These excessive costs necessarily increase the estimate, as shown by the appraisal. As an example of these excessive costs, the percentage of rock excavation necessary for the laying of mains is much larger than justified under all the evidence; common labor was estimated at 50 cents per hour, whereas the evidence shows the prevailing cost of such labor to be not in excess of 40 cents per hour. Some witnesses fixed the cost of such labor at 30 cents per hour. The trenches, for the laying of all mains and pipes, were to be dug by hand; whereas such trenches may be dug in Greencastle by machinery, thus reducing the cost very materially.

■ The "general construction cost," as shown by the appraisal, includes an item of $19,400 for interest during construction. As explained by Mr. Burnell, this item included interest at current rates upon the *entire* "construction cost" for the *entire* period of construction. This may be necessary in some instances, but for rate-making purposes it cannot be so considered in this case. Interest, calculated upon the amount of money invested from time to time as the work of construction progresses, is a proper charge for rate-making purposes. The amount of such interest, however, is to be determined by the actual amount of money necessary to be advanced upon the contract, for labor, material, supplies, etc., as the work progresses. However, the amount, as fixed in the appraisal, is greatly in excess of the amount necessary for the construction of the plant in question.

There are also contained, under the heading of "general construction cost," certain engineering costs and law expenses during construction, which are proper charges for rate-making purposes. The item of $12,200 for "miscellaneous expenditures during construction" includes every item of expense which might possibly be incurred during construction, however remote. Such expenditures are proper. However, the itemized list making up such total charge is greatly in excess of the expenditures necessary in the construction of such plant.

The appraisal also includes the following items, to wit:

| | |
|---|---|
| Organization | $ 26,800 00 |
| Working capital | 10,700 00 |
| Cost of financing | 28,700 00 |
| Going value | 60,000 00 |
| Total | $126,200 00 |

■ Greencastle being a thriving little city of 6,000 inhabitants, in which city is located De Pauw University, it is hardly conceivable that an organization cost of $26,800 would be incurred. Organization cost is a proper charge to be considered by the court in fixing the fair value of a utility for rate-making purposes. However, considering the location of this plant, and considering the entire testimony of the witnesses in this case concerning this cost, the amount as fixed by the Stone & Webster appraisal is greatly in excess of the amount necessary for organization purposes.

■ The item of "working capital" is also excessive. The subscribers pay for the service rendered by plaintiff periodically, often monthly, and out of this income the cost of operation is generally paid. For the purchase of fuel and oil, and for the payment of labor and contingencies arising between the times for collecting its bills, some capital is required. A reasonable amount is properly allowable for working capital, but the

amount, as fixed in this appraisal, is unreasonable.

The "cost of financing" has been held to be a proper charge to be considered by the court in fixing the fair value of a utility for rate-making purposes. Mr. Earl L. Carter, engineer for the defendant Commission, in this case, however, testified that, as an engineer, he did not consider the cost of financing as a proper charge, and therefore no amount was fixed in his appraisal covering this item. It cannot be seriously contended that the amount fixed by the appraisal of Stone & Webster, to wit, $28,700, is reasonable. As a matter of fact, such an amount for financing, when considered for rate-making purposes, is excessive, and is not entitled to much weight in determining the fair value of plaintiff's property for rate-making purposes.

It is contended that the property in question has a value, in addition to the value of its physical property, as a "going concern." In the commercial world the fact of its being a profitable concern, or otherwise, is a dominating feature, in arriving at its value; but it may be impractical in this case to give much weight to this element. The plaintiff is seeking an increase of rates in order that its investment may be more profitable; and if, as is probable, the very increase in its income materially increases its value as a going concern, the public may be called upon to pay a still higher rate, by reason of its increased prosperity and consequently larger going concern value. There is, of course, some value to be attached to its organization as a going concern and the expense that has been incurred in bringing it to its present state. The plaintiff, itself, up to the time the present owners acquired it, had long been carrying upon its books the item of going value at $14,648, and this court is not justified in fixing for this item a higher value than the plaintiff, itself, has fixed. Nothing has been called to our attention, since the recent acquirement of the stock by the present owners, which adds materially to this going value, and, under all the circumstances, this court is justified in considering the item of going value, as fixed in the appraisal, for rate-making purposes, as excessive.

It became necessary to comment rather extensively upon the appraisal of Stone & Webster, to demonstrate the fact that such appraisal, as a whole, is greatly in excess of the fair value of the property in question.

Mr. Earl L. Carter, chief engineer for the defendant Commission, made an appraisal of the property. The total cost of reproduction, as found by Mr. Carter, was $452,177, and after making the deductions for depreciation, he found the value of the property to be $331,657. To this depreciated value should be added $2,507, the cost of a levee, not included in his appraisal. The value of the property, less depreciation, as shown by his appraisal, is $334,164. However, Mr. Carter did not include in his appraisal any amounts for working capital or for going value. He did provide, however, for a charge of 15 per cent. as structural overhead.

The items of which this structural overhead is composed are explained by Mr. Carter in his appraisal in the following language: "15% allowed on the total of all items exclusive of Materials and Supplies to cover Engineering, Superintendence, Interest during Construction, Taxes during Construction, Fire and Liability Insurance, Small Omissions of Inventory, Contingencies, etc." Mr. Carter explained in his testimony that this 15 per cent. allowed for structural overhead is recognized by authorities as being sufficient to meet all general construction costs. The amount of such costs, as fixed by him, when depreciated, was $42,782. This amount is only $3,718 less than the "general construction costs," as contained in the appraisal of Stone & Webster.

It is therefore apparent that the vast difference between the value of plaintiff's property, as fixed by the appraisal of Stone & Webster, and as fixed by the appraisal of Mr. Carter, is represented by the different estimated costs of material and labor and the intangibles. Such intangibles are listed in the appraisal of Stone & Webster, as "Organization," "Working Capital," "Cost of Financing," and "Going Value."

The appraisals prepared by Stone & Webster and by Mr. Carter are each merely an estimate of the cost, taking into consideration all of the surrounding circumstances, as found by such engineers in the particular plant in question. Neither the Commission, nor this court, is bound by the value of the property, as fixed by an engineer. The weight to be given to such testimony is to be determined in the light of the facts of the case in hand. Such evidence, however, must be considered along with all other competent evidence, in determining the fair value of the property. It is in the nature of expert testimony, and the weight to which it is entitled is governed by the rules pertaining to such testimony. Ohio Utilities Co. v. Public Utility Commission, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656.

■ The court should also consider, in determining the fair value of the property in question, the fact that the common stock of the plaintiff was purchased by the present owners of such stock a short time prior to the filing of the petition before the Commission in July, 1927. Under the evidence, the total purchase price, including the price paid for the common stock, bonded indebtedness, and all assumed corporate obligations, was $274,932.87. While it is true that the purchase price does not necessarily fix the value of a property, yet it is some evidence of value, especially when we consider the fact that this particular property had been offered for sale for many months prior to the purchase thereof. There is no evidence that the price paid was not the fair value, as fixed by the sellers of the stock. There is some evidence, however, that the present owners of the common stock have been offered considerable more money for such property than its actual cost to them. In fixing the fair value of utility properties for rate-making purposes, the purchaser of the property cannot be denied the benefit of a bargain, if he purchased such property at a price less than its value, provided it satisfactorily appears from the evidence that the value of such property is substantially in excess of the purchase price. The purchase price of the property in question does not necessarily fix the fair value of such property. It is, however, evidence to be considered in determining such fair value.

Under the laws of the state of Indiana, taxing authorities are required to assess property for taxation at its fair cash value. The tax return for the plaintiff for the years 1927 and 1928 are in evidence, which returns fixed the value of such property at $208,744.26 and $211,470.18 for the two years, respectively. In each of these returns, there was included the sum of $14,648 for going value, which was the amount as fixed by the plaintiff. While the evidence of the value of the property for taxing purposes should be considered by the court in fixing the value of such property for rate-making purposes, yet it is by no means controlling.

It has been heretofore stated that the value of the property in question, as fixed by the defendant Commission in the year 1920 for rate-making purposes, was $170,000. This amount was only $2,684 less than the value of such property, as fixed by the plaintiff, itself, at that time. If there is added to this amount the subsequent additions to said property, as shown by the evidence, the value at this time will be $207,312.01. The value of the property, as shown by the books of the

plaintiff on August 31, 1927, was $210,584.88, which amount includes going value. This, of course, is evidence which must be considered by the court in arriving at the fair value of said property. However, we must consider the fact, as shown by the evidence, that the price levels since the year 1920 have advanced materially, thus increasing the value of said property.

■ Neither this court, nor the defendant Commission, can determine the fair value of the property of plaintiff, unless such value is based upon legal evidence. In other words, the judgment of a court or the order of a Commission cannot be sustained unless the finding of such court or Commission, upon which such judgment or order is based, is supported by legal evidence which will justify such finding. In this case, the value of plaintiff's property, as found by the Commission, to wit, $300,000, was less than the fair value of such property at the date of the hearing, and for a reasonable time thereafter, as shown by the evidence.

■ The court will next consider the question of whether or not the schedule of rates, as fixed by the order of the Commission under date of October 6, 1928, will yield a reasonable return upon the fair value of plaintiff's property, as found by this court.

It is agreed by the parties that the schedule of rates, as fixed by the Commission in its order of October 6, 1928, will yield a gross annual income of $58,737.40 (including non-operative revenue of $482.21). This is approximately $2,000 more than the income of plaintiff, under the schedule of rates as fixed by the Commission in 1920 and 1922. It is contended by the plaintiff that, after the payment of operating and other expenses, there will be a net amount available for return of $14,814.87. The defendant Commission contends that many items of expense, as charged by the plaintiff, are excessive, and should not be permitted; that the amount available for return is greater than that claimed by plaintiff, and is sufficient to yield a reasonable return upon the fair value of the property. The finding of the Commission did not specifically deal with any of the items comprising the operating expenses, except the expense of the rate hearing. We therefore do not have the benefit of the views of the Commission respecting the propriety of these items. The expense of the rate hearing, however, as fixed by the Commission, and as amortized over a period of five years, is reasonable, and cannot be disturbed by this court.

The present owners of the property in question have incurred additional expenses since they took charge of the company, much of which will not recur from year to year, and should not be considered as an annual charge for rate-making purposes. However, there are certain increased expenses caused by the necessity of increasing the wages of some of the employees. It was shown by the evidence that these employees are rendering valuable services, and that the wages paid them are reasonable.

The increase in operating expenses for the year ending September 30, 1928, consists of an increase over the year ending December 31, 1926, in the following items, to wit:

| | |
|---|---|
| Pumping expenses | $1,253 76 |
| Distribution expenses | 1,634 51 |
| Commercial expenses | 203 91 |
| General expenses | 1,609 65 |
| Undistributed expenses | 153 58 |
| Total increase | $4,860 41 |

Plaintiff also asks an increase for depreciation in the sum of $1,025.91, and an increase for taxes in the sum of $630.30, thus making a total increase in the operating expenses of $6,516.62 over the previous year.

While there will necessarily be a slight increase in the operating expenses, as the number of consumers increase, yet several items of expense for the year ending September 30, 1928, are considerably in excess of the reasonable amount of such expenses, as shown by the evidence. The increase in general expenses is accounted for by an increase in the salaries paid the officers, office rent, office supplies, miscellaneous expenses, etc. These increased expenses, in our opinion, will not recur from year to year, and there is, at least, an excessive charge of $1,500 in the general expenses for the year ending September 30, 1928. While the question of the amount of taxes to be paid from year to year is more or less speculative, yet it is hardly conceivable that there will be an increase in the taxes to be paid to such an extent that it justifies an additional amount being charged to operating expenses of the plaintiff for rate-making purposes. Considering all of the evidence in this case relating to operating expenses, and conceding that there is an increase in the depreciation of $1,025.91, yet the total increased operating expenses of $6,516.62 is excessive, and should be reduced by at least $2,500.

In this view, the income available for return will be substantially $2,500 greater than that reported by plaintiff as its actual net earnings for the year ending September 30, 1928. It is conceded that the rates fixed by the Commission will yield an additional income of approximately $2,000, thereby making the total amount available for return, under the rates fixed by the Commission, in excess of $19,000, subject to reduction by the amount of the federal income tax attributable to the overplus of net profit beyond the amount as reported by the plaintiff.

The net amount thus available for return, under the schedule of rates as fixed by the Commission in its order of October 6, 1928, is inadequate to yield a reasonable return upon the minimum value of plaintiff's property, as hereinafter found by the court.

Having determined that the fair value of the plaintiff's property, as found by the Commission, is inadequate, this court, upon all the evidence, finds the fair value of such property to be not less than $350,000, and that a return of 6½ per cent. upon that amount, after providing for all proper operating expenses, including amortization of the rate case expenses over a period of five years, taxes, and depreciation at the rate of 1 per cent. per annum on the book value of its depreciable property, will not be confiscatory.

The rates in issue are confiscatory and in violation of plaintiff's rights under the Fourteenth Amendment to the Constitution of the United States. The defendants will therefore be permanently enjoined from enforcing, or attempting to enforce, the order of October 6, 1928.

A decree will be prepared accordingly.