## UNION STOCK YARDS CO. OF OMAHA, Limited, v. UNITED STATES et al.

### No. 1260.

District Court, D. Nebraska, Omaha Division. July 7, 1934.

870

Norris Brown, of Omaha, Neb. (David A. Fitch and Ralph M. West, both of Omaha, Neb., on the brief), for petitioner.

Wendell Berge, Sp. Asst. to Atty. Gen., Harold M. Stephens, Asst. Atty. Gen., Carl McFarland, Sp. Asst. to Atty. Gen., and Seth Thomas, Sol., Department of Agriculture, of Washington, D. C., and C. E. Miles and G. N. Dagger, both of Washington, D.

C. (Ambrose C. Epperson, of Omaha, Neb., of counsel), for defendants.

Before GARDNER and WOODROUGH, Circuit Judges, and MUNGER, District Judge.

### WOODROUGH, Circuit Judge.

This is a suit in equity brought by the Union Stock Yards Company of Omaha in accordance with section 316 of the Packers and Stockyards Act of 1921 (7 USCA § 217) to enjoin the enforcement of the order of the Secretary of Agriculture of March 1, 1933, prescribing maximum rates and charges to be collected by the plaintiff for its stockyard services. The order of the Secretary was heretofore temporarily enjoined by this court, and the case is now for decision on the merits.

The hearings and inquiry of the Secretary began January 13, 1932, and continued until March 1, 1932. He heard numerous witnesses, including appraisal experts who testified as to the value of plaintiff's land, and expert accountants and engineers who gave testimony on the rate of return and of other factors entering into the determination of the reasonableness of rates and charges. Although the taking of testimony was concluded on March 1, 1932, oral arguments before the Secretary were not heard before September 19, 1932. The plaintiff requested an additional sixty days for the filing of briefs which were, in fact, submitted on November 17, 1932. Plaintiff made no request at the time of oral argument or upon the filing of its briefs for an opportunity to submit additional evidence which would tend to show changed operating or economic conditions on account of which any order of the Secretary based upon the original record might be subject to modification in plaintiff's favor. On December 7, 1932, some three weeks after final submission of the case to the Secretary, plaintiff filed a petition with the Secretary alleging that changed economic conditions due to the depression had occasioned such decrease in the receipts of livestock during the year 1932 that the case should be reopened and rehearing should be granted, affording the plaintiff an opportunity to submit further evidence; that certain new construction to the value of $500,000 has been undertaken which would increase the rate base upon which plaintiff was entitled to earn a fair return; and that any order based on the original record would be confiscatory.

On March 1, 1933, the Secretary denied the petition for rehearing, setting forth the grounds of the denial in paragraph 123 of his findings. On October 2, 1933, this court appointed a special master to take testimony on the issues as to the order of the Secretary denying rehearing, and on November 20, 1933, testimony was offered before the master relating to receipts of the plaintiff for 1932 and the first ten months of 1933, and to the net return of the company during the same period, thus bringing the record forward to that date. The plaintiff's secretary-treasurer, Mr. Shawcross, stated that during the ten-month period (1933) there had been an increase in receipts of 49,497 cattle, a decrease of 5,707 calves, 149,742 hogs, and 305,823 sheep, and an increase of 8,091 head of horses and mules. The percentage decrease in volume of receipts for 1932 over 1931 was 14.9; and for the ten months of 1933 as compared with the same period of 1932, the per cent. of decrease in volume was 6.6. He also testified that during the period, March 31, 1931, to September 30, 1933, there was spent in addition and betterment work $429,217.62, approximately $392,800 of which was used in the construction of a new sheep barn. Mr. Dozier, for the government, testified that for the year 1932 the earnings of sixteen public utility corporations already referred to in the record were 5.68 per cent. and the earnings of certain industrials were 1.08 per cent. Mr. Bachman, for the government, presented an audit of the books of the plaintiff for the period since the original hearing. As to the return of the company for the year 1932 on the charges then in force, he found that the net earnings of the company were about $700,000, or 6½ per cent., on the Secretary's prescribed rate base. He testified that if the new rates had been in effect there would have been very little difference in the net operating income for rate making purposes. While there were decreases in volume of receipts, they were offset by changes in the way the volume came in; that is, increases in cattle and horses taking a high rate were offset by decreases in hogs, sheep, and calves which take a lower rate. Further, the increased truck transportation which takes a higher rate tended to offset decreases in volume. Also a greater profit would have been realized in hay for the reason that the Secretary's order permitted the company to earn a greater differential on that item. He stated that the rate of return would have been about 6½ per cent. under the new rates and charges for the year 1932. He al-

so found that the additions and betterments testified to by Mr. Shawcross would ultimately have increased the Secretary's rate base by only $150,000, the old sheep barn being included in the original figure and the rate of return would have been reduced immaterially, for example, from 6.5 per cent. to 6.45 per cent.

The testimony introduced at the second hearing does not indicate that the Secretary abused his discretion in denying the petition for rehearing.

That a petition for rehearing need not be granted as a matter of course upon allegations of changed economic conditions is settled in United States v. Northern Pacific Ry. Co., 288 U. S. 490, 53 S. Ct. 406, 407, 77 L. Ed. 914, which relieves of doubt as to the meaning of the opinion in the case of Atchison, T. & S. F. Ry. v. United States, 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273, relied upon by the plaintiff. In the Northern Pacific Case the court said: "The decision in the Santa Fé Case is not to be extended to require a rehearing in every rate case for changed economic conditions, however insignificant the effect of the order on carrier revenue."

The decision of the three-judge court in St. Joseph Stockyards Co. v. United States (D. C.) 58 F.(2d) 290, is also clearly distinguishable from the situation here presented. In that case the original hearing was conducted by the Secretary of Agriculture in December of 1929, and the petition for rehearing was filed by the stockyards owner on February 11, 1931, when the country was in a low stage of the depression. The court itself heard testimony relative to the change in economic conditions and the decrease in petitioner's receipts and found that the action of the Secretary in denying rehearing was arbitrary and unlawful and that the rates and charges prescribed were confiscatory. On the contrary, in the present case the hearing was conducted in 1932 when the country was at a low stage of the depressed business conditions. The Secretary was conversant with the conditions. No evidence of decreased receipts or new building construction was introduced at that hearing.

We deem the reasons given by the Secretary for a denial of the petition to reopen (paragraph 123 of his findings) sufficiently disclose that the ruling was not arbitrary or unlawful and the rights of the plaintiff must be determined upon analysis of the whole record.

The bill of complaint charges that the findings and order of the Secretary of Agriculture are contrary to law, arbitrary, unsupported by the evidence and confiscatory of plaintiff's property, in violation of the Fifth and Fourteenth Amendments to the Constitution, and the answer puts in issue all of the material allegations. We will discuss contested issues as follows:

(1) Whether the real estate of plaintiff was given an unfair valuation,

(2) Whether there was an unjustified exclusion of the value of certain lands from the rate base as used and useful.

(3) Whether a proper rate of return was allowed plaintiff.

(4) Whether working capital was properly computed.

(5) Whether charges for services were fixed on an allowable basis under the evidence.

(6) Whether the charges for traders were lawful.

(7) Whether a sufficient test period was taken.

(8) Whether accrued depreciation was properly determined.

(9) Whether the evidence supported the findings and order as to the amount of annual reserve for depreciation.

(10) Whether certain items of expense were improperly eliminated.

▆▆▆ In considering the questions presented we recall at the outset that the power to fix rates is not lodged in the courts but ratemaking is a legislative process. In the process discretion must be exercised, and in this case the discretion was lodged in the Secretary of Agriculture. The legislative discretion so lodged in the Secretary necessarily extends to the entire process by which he arrived at the schedule of rates prescribed, embracing the method he used in reaching it as well as the determination itself. "We are not concerned with either so long as constitutional limitations are not transgressed." We have in the elaborate and comprehensive findings and conclusions of the Secretary a full disclosure of the methods by which he arrived at the rates fixed and the methods so disclosed have a definite bearing upon the result which has been reached, but our judicial function does not go beyond the decision of the constitutional question whether the rates as fixed are confiscatory. His findings of fact supported by substantial testimony are not subject to review. It is not

the province of the courts to substitute their judgment for that of the Secretary, and we cannot upset what he has done unless the plaintiff has sustained the burden of proof upon it and has clearly established confiscation of its property. If through erroneous applications of rules of law undervaluation of parts of the property has been occasioned, still it does not necessarily follow that the court must enjoin the rates ordered. It appears that in arriving at the total valuation upon which the plaintiff is entitled to receive compensatory income the Secretary added a million dollars to the true values of the lands as found by him and that he also made allowances in plaintiff's favor in other respects. Though plaintiff earnestly contends that "the court is powerless to allocate this increased allowance to the different findings," we hold to the contrary, that where compensating overvaluations or allowances are disclosed they may supply a "margin for correction" so that if upon the whole, unlawful confiscation, which this court has power to enjoin, has not been proven, no injunction should issue.

**▆▆▆ Real Estate Valuation.**—As the plaintiff maintains and operates a market place for live stock, the first task of the Secretary was to put a rate base value on the site of the market—the land used as a market place. The plaintiff's holdings include some 11,-951,514 square feet of land and constitute a most important item of its assets, and the rate which it may justly charge for its services depends in a large measure upon the valuation which may be justly ascribed to its lands. The Secretary heard the testimony of five witnesses on the subject. The four witnesses for the plaintiff valued the naked lands respectively at $5,900,632, $7,171,087, $7,918,442, and $7,555,919; the difference between the low figures and the high figures arrived at by plaintiff's witnesses being something over $2,000,000; the average estimate of its witnesses being something over $7,000,000. On the other hand, but one witness, Mr. John A. Zelinski, testified on behalf of the government, and in his opinion the value was $1,741,416.00. It was the conclusion of the Secretary that the true value was that arrived at by the government witness and he adopted the valuation of $1,-741,416 and included it in his computation of the rate base.

The valuation, so conforming to the appraisal made by Mr. Zelinski, is assailed as arbitrary, unreasonable, and unjust.

First it is argued that the witness was disqualified. It appears from his cross-examination before the Secretary that at the time he was employed by the Department to make the appraisal that he told the officers what he "thought he could do" and went into details as to how he thought the property should be appraised, and after he went to Omaha to make the appraisal he worked together with the witnesses Wilson T. Graham and Edward M. Slater. They collaborated with him in gathering information and data up to the point of putting a valuation on the property. Both Mr. Graham and Mr. Slater, as stated, formed opinions of value and made up reports reflecting the same. On the hearing before the Secretary plaintiff insisted that these reports be produced while Mr. Zelinski was on the witness stand for cross-examination. Counsel for the government objected to producing them, but finally, on authority from the Solicitor of the Department of Agriculture, the government consented that plaintiff might examine the Slater and Graham reports, but that if they were to be put in evidence plaintiff should be required to produce these men as its own witnesses so that the government might have an opportunity to cross-examine them. They were both placed on the witness stand by the plaintiff and subjected to cross-examination by the government. We are not persuaded that the testimony proved the government witness to be unworthy of credit. The matters brought out by the plaintiff were properly matters of argument presented to and considered by the Secretary, but the credibility of the witness and the weight to be given to his testimony were for the consideration of the Secretary, and in the absence of fraud or imposition, the arguments can be given no weight in this court.

Plaintiff insists that Mr. Zelinski lacked the qualifications of an expert witness on the values involved, that his methods were improper, and that certain factors used by him in arriving at his valuation were unwarranted.

If the witness had such qualifications as to entitle him to testify, then the Secretary had authority to accept his valuation, unless his testimony was mere conjecture. Los Angeles Gas & Electric Corp. v. R. R. Commission, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; Ohio Utilities Co. v. Public Utility Comm., 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656; New York & Colo. Mining Syndicate & Co. v. Fraser, 130 U. S. 611, 9 S.

Ct. 665, 32 L. Ed. 1031; Westinghouse Electric & Mfg. Co. v. Denver Tramway Co. (D. C.) 3 F.(2d) 285; Greencastle Water Works Co. v. Public Service Comm. (D. C.) 31 F. (2d) 600; United Fuel Gas Co. v. P. S. Comm. of W. Va. (D. C.) 14 F.(2d) 209. Our examination of the record discloses abundant proof of the qualification of this witness to testify, and we deem a recital of the facts with reference to his training and experience unnecessary.

In Union Trust Co. v. Woodrow Mfg. Co. (C. C. A. 8) 63 F.(2d) 602, 607, in an opinion by the late Judge Kenyon, it is said, quoting from Ruling Case Law: "'In regard to property value, the standard of qualification of the witness cannot usually be fixed very high. Not only are professional appraisers or dealers in this class of property in question competent as witnesses, but also others who have bought and sold similar property, or who know the prices paid therefor, even though that knowledge is based on secondary evidence, provided, of course, they are familiar with the property in question. Such witnesses are not, like experts, supposed to have science and skill superior to that of the jurors, but have a knowledge of the particular facts which the jurors have not.'"

In Spiller v. Atchison, Topeka & Santa Fé Ry. Co., 253 U. S. 117, 40 S. Ct. 466, 471, 64 L. Ed. 810, the court said: "Whether he had shown such special knowledge as to qualify him to testify as an expert was for the Interstate Commerce Commission to determine; and its decision thereon is not to be set aside by the courts unless clearly shown to have been unfounded, which cannot be said in this case."

As to the amount of the appraisement, no two of the appraisers followed the same method or used exactly the same factors in arriving at their respective valuations. Mr. Zelinski stated that in his opinion the elements which go to make up value are the possible utility of land for a number of uses; its accessibility; its location with respect to the lines of travel and highways; in the case of industrial lands, their availability for trackage, their topography and general location with respect to markets, the centers of population, and the general economic uses to which the land can be put. He investigated sales in the vicinity of the land and considered sales in other sections of the city, which, in his judgment, had some bearing in determining the value of the land in question. A detailed comparison of the methods used by this witness with those employed by the other witnesses, or of the factors they considered in arriving at value, would unnecessarily prolong this opinion. In determining the vexed question of land values, courts have not required rigid formulæ, arbitrary rules, nor exact processes of valuation to be applied. We cannot say that any of the methods followed, or the factors going into the Zelinski valuation, were so unwarranted as to justify discarding his appraisement. The mere fact that Mr. Zelinski's appraisal is lower than that of the other four is, of course, not enough to overthrow it in this court. The Secretary approved it and the question of the weight of the evidence was for him and not for this court. Florida et al. v. United States et al., 292 U. S. 1, 54 S. Ct. 603, 78 L. Ed. 1077; Merchants' Warehouse Co. v. United States, 283 U. S. 501, 508, 51 S. Ct. 505, 75 L. Ed. 1227; Assigned Car Cases, 274 U. S. 564, 580, 47 S. Ct. 727, 71 L. Ed. 1204; United States v. Louisville & Nashville R. Co., 235 U. S. 314, 320, 35 S. Ct. 113, 59 L. Ed. 245; Int. Com. Comm. v. Louisville & Nashville R. Co., 227 U. S. 88, 92, 33 S. Ct. 185, 57 L. Ed. 431; Skinner & Eddy Corp. v. United States, 249 U. S. 557, 39 S. Ct. 375, 63 L. Ed. 772; Seaboard Air Line R. Co. v. United States, 254 U. S. 57, 62, 41 S. Ct. 24, 65 L. Ed. 129; Akron, C. & Y. R. Co. v. U. S. (New England Divisions Case), 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Western Paper Makers' Chem. Co. v. United States, 271 U. S. 268, 46 S. Ct. 500, 70 L. Ed. 941.

Neither can we say as a matter of law that the methods employed by Zelinski were so erroneous, or the factors to which he may have given weight so unrelated to the question of value, as to make his conclusions necessarily erroneous.

In Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 225, 74 L. Ed. 524, the court said: "We find in the evidence before the Secretary ample support for the findings and the conclusion reached by him. It may be that some of the evidence was irrelevant or of little weight, and that some of the reasoning was not persuasive. But mere admission by an administrative tribunal of matters which, under the rules of evidence applicable to judicial proceedings, would be deemed incompetent, or mere error in reasoning upon evidence adduced, does not invalidate an order made by it. United States v. Abilene & Southern Ry., 265 U. S. 274, 288, 44 S. Ct. 565, 68 L. Ed. 1016; Northern Pacific Ry. Co. v. De-

partment of Public Works, 268 U. S. 39, 44, 45 S. Ct. 412, 69 L. Ed. 836. It has been settled in cases arising under the Interstate Commerce Act that, if an order rests upon an erroneous rule of law, Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83, or is based upon a finding made without evidence, Chicago Junction Case, 264 U. S. 258, 263, 44 S. Ct. 317, 68 L. Ed. 667, or upon evidence which clearly does not support it, Interstate Commerce Commission v. Union Pacific R. Co., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308; New England Divisions Case, 261 U. S. 184, 203, 43 S. Ct. 270, 67 L. Ed. 605; Colorado v. United States, 271 U. S. 153, 166, 46 S. Ct. 452, 70 L. Ed. 878, the order must be set aside. These rules are applicable also to suits arising under the Packers and Stockyards Act. But the order here assailed is not subject to any of these infirmities."

Although the Omaha realtors who testified for the plaintiff before the Secretary were of high standing in their vocation, able, and broadly experienced, their opinions had no such conclusive force that there was error of law in the refusal of the Secretary to follow them. They have made a life study of properties with a view of acquainting themselves as to the gains that may be derived from them and from the traffic in them. But the market place property of the plaintiff is not such property as is ordinarily the subject of barter and sale, and when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision, so that the value of such property or rate base must be determined under inescapable limitations. The problem of the Secretary was not to find what the plaintiff might be able to gain by its monopoly, but rather what reasonable amount it ought to receive, having regard to the public interest and to the value of its property. Therefore, the testimony of the realtors had "no such commanding quality" as "to apply coercion to the judgment of the appointed tryer of the fact" and exclude other choice. Dayton Power & Light Co. v. Pub. Util. Comm. of Ohio, 292 U. S. 290, 54 S. Ct. 647, 654, 78 L. Ed. 1267.

 *Excluded Lands.*—For the purpose of valuation the lands of the plaintiff were divided into eighteen zones, the square footage of land in each being carefully computed. In making up the rate base upon which the plaintiff would be entitled to receive a compensatory return, the Secretary excluded from it the value of certain property owned by the plaintiff, but which the Secretary found was not used and useful in the rendition of stockyards services. The plaintiff insists that the excluded lands contained in certain of the zones were used and useful in rendering the stockyards service and that the other lands were held in good faith for future expansion or for sale to packers or others who would increase the buying power of the market. It contends the Secretary had no power as a matter of law to exclude the value of any of the lands from the rate base.

The Packers and Stockyards Act imposes the duty upon the Secretary of Agriculture to determine and prescribe reasonable and just charges for stockyards services, and it is a necessary implication of such duty that the line must be drawn between properties used and useful in the rendition of the stockyards services and all other properties. The statute defines "stockyard services" as follows (section 201 (b), title 7 USCA): "The term 'stockyard services' means services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock."

We are of opinion that the rates prescribed by the Secretary cannot be found to be confiscatory without proof that the returns provided are insufficient to provide a fair return upon the reasonable value of the property used and useful for the public, and that the determination of the question whether particular property is so used and useful is for the Secretary.

In his findings the Secretary has described with particularity the lands which lie in each of the 18 zones into which all of the lands were divided. It appears that the land contained in zones numbered 1, 9, 10, 11, 15, 16, and most of 17 were in the main practically vacant lands. The valuation put upon them by Mr. Zelinski in the aggregate was $201,302.42. The testimony for the plaintiff tends to show that some of its officers honestly believed that some of these lands might ultimately be needed to carry on the stockyards service, but there were no plans for so using any of them in the early future. It is hoped that new packing houses may at some time be established on some of the property, which would result in increasing the buying power of the market; but it does not appear that there has been any occasion for expansion upon new lands

within recent years or that those in use have been inadequate, even at the peak of the business activity, to meet all demands, nor is there any near prospect of additional land requirements for stockyard purposes. Without undue elaboration, we are satisfied that the refusal of the Secretary to include in the rate base the $201,302.42 of value of tne nearly vacant land comprised in zones 1, 9, 10, 11, 15, 16, and 17 was not shown to be arbitrary or unjustified, but was a lawful determination within the margin of his fair discretion such as was sustained by the Supreme Court in Columbus Gas & Fuel Co. v. Pub. Util. Commission, 292 U. S. 398, 54 S. Ct. 763, 767, 78 L. Ed. 1327, 91 A. L. R. 1403. The court said: "There will be no need in the computation of the rate base to include the market or the book value of fields not presently in use, unless the time for using them is so near that they may be said, at least by analogy, to have the quality of working capital. The arrival of that time cannot be known in advance through the application of a formula, but within the margin of a fair discretion must be determined for every producer by the triers of the facts in the light of all the circumstances."

The plaintiff stresses the decision of the three-judge court wherein the action of the Secretary in excluding the value of certain lands from the rate base was found to be unlawful. But we think the situation presented in this case should be contrasted with the situation before the court in Denver Union Stock Yard Co. v. United States (D. C.) 57 F.(2d) 735. There the court said [page 746 of 57 F.(2d)]: "The evidence is undisputed that during the 45 years of its history, while there have been cycles of good years and bad years, nevertheless there has been a general upward trend in the business. The evidence is likewise undisputed that the petitioner has about, if not quite, reached the limit of its present facilities. During the times of the peak load, the facilities are not now adequate. The directors of the petitioner undoubtedly realized that land must be acquired for expansion in the immediate future, and that such land must be adjacent to the present plant, and that the amount of such adjacent and vacant land was limited. * * * In this situation, there can be no question but that it was sound business judgment, in the interest of the corporation and its patrons, to acquire this adjacent real estate while it was cheap and unimproved; and the Secretary has so found. To have waited until the adjacent property was im-

proved, or until the owners could have taken advantage of its imperative need, would be to saddle upon the patrons an extravagant and unnecessary load. Confronted with this situation, the petitioner acquired at a reasonable price tracts of vacant ground, suitable for expansions that were reasonably deemed to be necessary reasonably soon. Plans had been prepared for construction on one tract of 19.825 acres and on another of 12.64 acres; other tracts had been acquired for material yards and to increase the facilities for trackage and railroad car storage. Without discussing the tracts excluded in detail, it is sufficient to say that the evidence discloses without dispute that all of them were acquired in good faith, and for the purposes of such expansion of its facilities as the directors believed to be reasonably imminent. The petitioner owned no other land available for expansion." We do not consider our holding on the point in this case to be in conflict with that of the Denver Case. It does not affirmatively appear from the record in this case exactly when the plaintiff acquired the excluded vacant lands. These stockyards were founded some 50 years ago and up to this time the lands have not been required, and there being no fair basis for prediction as to when they may be, the basis of the Secretary's ruling is substantially different from that considered by the court in the Denver Case.

The excluded lands comprised in the twelfth zone, commonly called the "Cudahy road," have an area of 77,527 square feet and were valued at $13,954.86. From the evidence in the record it appears that the property is simply a public street which has been open to and used by the public without restriction for more than forty years. We cannot say that the exclusion of its value from the rate base was erroneous.

The excluded lands and improvements contained in zones 4, 5, 8, 13, and 14 are put to uses more or less related to the business of the stockyards. We do not feel called upon to discuss them minutely or to dwell at length upon the ruling of the Secretary in regard to them. The Secretary has added to his valuation of all the lands the sum of $1,000,000 in excess of the true value as found by him, which "supplies a margin for the correction of other contested items that may approach the border line." Dayton Power & Light Co. v. Pub. Util. Comm. of Ohio, supra; Los Angeles Gas & Elec. Co. v. R. R. Comm. of Cal., supra. Indeed, the

margin for correction allowed by the Secretary is so large that the whole question of the lands excluded as not used and useful becomes of no controlling significance in our decision of the case.

■ *Rate of Return.*—The Secretary found that a rate of return of 6½ per cent. on the fair value of respondent's property used and useful in the rendition of stockyards service would be an "ample" compensatory rate, but he took into consideration the holding of the three-judge court in Denver Union Stock Yard Co. v. United States, supra, and St. Joseph Stockyards Co. v. United States (D. C.) 58 F.(2d) 290, where it was held in relation to stockyards services that a 7½ per cent. rate of return was a minimum, and he accordingly used a 7½ per cent. rate of return as one of the rate factors. Whether in more normal and prosperous times a larger return would have been necessary to avoid confiscation is beside the mark; "the problem is one to be tested primarily by present day conditions," United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390, and investments in public utilities may not in these times demand the larger returns to which they may be entitled in times of expansion (Idem). We are, therefore, of the view that the allowance of a return of 7½ per cent. per annum cannot be said to be unreasonably low under present economic conditions. Los Angeles Gas & Electric Co. v. R. R. Comm., supra; Smith v. Ill. Bell Telephone Co., 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255; Clark's Ferry Bridge Co. v. Public Service Comm., 291 U. S. 227, 54 S. Ct. 427, 78 L. Ed. 767; Dayton Power & Light Co. v. Pub. Util. Comm. of Ohio, supra; Atchison, Topeka & Santa Fe R. Co. v. United States, 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273; Bluefield Water Works & Imp. Co. v. Pub. Ser. Comm., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176.

*Working Capital.*—The Secretary allowed the sum of $155,000 for working capital. It is pointed out by plaintiff that at certain times larger sums are required for such items as feed, materials, and insurance. In fixing the sum at $155,000 an average was struck, and this seems to be fair to plaintiff. This method was approved in Reno Power, Light & Water Co. v. Pub. Serv. Comm. (D. C.) 298 F. 790, 797, where the court said: "It is necessary that the company should have on hand at all times a sufficient amount of money to meet its current expenses, and a reasonable quantity of such supplies, stores, and repairs as are con-

stantly being used and consumed in the manufacture of gas; but rates are collected monthly, and when received are at once available to meet the pay roll and other current outlays. For this purpose it would seem that an amount equal to its ordinary expenditures for two months should be sufficient."

Plaintiff's operations are substantially on a cash basis. It does not appear that the larger expenditures for different items to which plaintiff refers occur at the same time, and it does appear that the average amount allowed will enable it to meet its normal requirements as they arise.

■ *Schedule Basis.*—It is charged in the bill of complaint that the rates and charges prescribed by the Secretary were fixed by him without evidence showing or tending to show the cost of any service to the plaintiff or the value of any service to the user, and without any evidence on which to determine the relation of one service to another, or of one rate to another.

The answer admits that the record contains no evidence as to the cost of rendering any particular service, but it is alleged that the evidence shows the cost of rendering services as a whole, and that petitioner is amply compensated for the cost of services rendered by the rates fixed by the Secretary. The answer also admits that there was no evidence as to the value of particular services to the user nor of the relation of one service to another, or of one rate to another; but it is alleged that the rates prescribed by the Secretary bear the same ratio to each other as the rates for the various services established by plaintiff in the existing rate schedules. Counsel for defendants in their brief say: "In approaching the question of the cost of rendering the service, the Secretary did not attempt to arrive at differentiated costs for each separate service. The character of petitioner's business is such that it does not lend itself to a satisfactory cost analysis upon that basis. Petitioner does not keep its records and accounts in such manner as to determine the cost of each service. * * * The schedule of rates prescribed by the Secretary does not impose any injustice or disproportionate charges on different classes of livestock and the relation between the charges for yarding the different classes of livestock is substantially the same as it heretofore has been under the old rate schedule."

It appears that the plaintiff's business is operated largely as a unit in the perform-

ance of the different services for which rates are charged and the character of the business is such that a cost analysis on the basis of differentiated costs for each separate service would not be feasible nor would it serve any practical, useful purpose. Although the performance of the various functions by the plaintiff in the rendition of the services is specialized to the extent that there are different operating departments, there is flexibility in the organization in order that those who are assigned to certain tasks at one time may be shifted to the performance of other tasks at other times, and there is close inter-relation of operating departments. The rates on feed were fixed on the basis of cost plus a reasonable profit. To the extent that reductions were made in yardage charges, such reductions were uniformly applied to the charge for each species. The schedule of rates prescribed by the Secretary maintains the relation between the charges for yarding the different classes of live stock substantially the same as it has been heretofore. The plaintiff itself has, over a long period of years, evolved a rate schedule establishing certain relationships between the rates of charge for yarding the different classes of live stock, and these same relationships have been taken into account and have been recognized by the Secretary. No reason is suggested why the Secretary should not have given them consideration as he did in making up his rate schedule. The percentage differences in the reductions as to the different species are unsubstantial and practically negligible. According to the computation of the plaintiff the percentages of the reductions made by the Secretary applicable to the different classes of live stock vary within a zone of less than 4 per cent.

By the Packers and Stockyards Act the Secretary was empowered to regulate stockyards charges, and the order here involved established an initial and comprehensive schedule; the sole test of its validity in this court being whether or not confiscation is proven. We may not assume, in the absence of evidence, that the schedule is inconsistent in its several parts but must refuse our injunction if, on the whole, no confiscation is proven.

It is doubtless true that after a rate schedule has been lawfully established and put in force and thereafter it is proposed to increase or diminish an item of charge, the advantage to the patrons and the cost to the utility are considerations necessary to be taken into account. Vandalia R. Co. v. Schnull, 255 U. S. 113, 41 S. Ct. 324, 65 L. Ed. 539; Northern Pacific R. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1. But to maintain that the Secretary, in establishing the initial rate schedule, which he was empowered to promulgate, was required to destroy long-established relationships between charges and set up his own differentiations upon original evidence would simply deny to the Secretary the power conferred upon him by Congress. The plaintiff offered no evidence to indicate injustice to it in any of the relationships between the different service charges, and we are not persuaded that the adoption by the Secretary of substantially the same relationships between items of charge as the plaintiff itself has evolved and maintained violated any constitutional right of the plaintiff.

■ *Yard Traders.*—The Secretary found:

"24. There is a separate section within the cattle division known as the 'traders' division.' If cattle are purchased by a dealer, they are either received by the dealer at the scales or from the purchaser's holding pens, and are removed by the purchaser to the traders' division. The physical characteristics of the traders' division are substantially the same as those of the commission division, and the service rendered by respondent with respect to livestock held in each division does not differ materially. The stocker and feeder class of cattle make up an important part of the cattle receipts at Omaha, especially during certain seasons of the year. Stockers and feeders are purchased by country feeders and farmers. The function which the dealer performs is to purchase cattle of these classes and grade and sort them into lots which will meet the demands of buyers. The respondent makes no yardage charge on livestock sold to go to the country for the facilities and services furnished in the traders' division. The regular charges are made for feed. In most instances the livestock purchased by traders is resold by them. Occasionally, however, traders will move their livestock to the commission division and employ the services of a commission firm in making the sale. This practice is known as 'planting.'"

"120. It has been shown herein that the structure of respondent's existing schedule of rates and charges is such that with the exception of livestock resold, which is not resold to go to the country, all yardage charges are assessed against and collected

from those who cause the livestock to come to the stockyard. Those who purchase livestock within the stockyard fall within two general classes, namely (1) those who purchase to remove it from the stockyard, and (2) those who purchase to resell and otherwise trade in it within the stockyard. The service rendered the first class of purchasers consists chiefly in holding the livestock for a reasonable period until it can be removed from the yard. On the other hand, the second class of purchasers have set up their place of business within the stockyard and they have done this without charge except insofar as respondent may benefit from the profit on feed which they buy and from the income which may be realized from the yardage charge on resales where the stock resold does not go to the country. It may be that the respondent has the right to furnish free yardage to one class of its patrons if by doing so it does not become necessary to maintain higher charges for the services rendered to others. However, it is unjustly discriminatory as well as unreasonable for respondent to maintain a large section of valuable property and to incur numerous expenses in the rendition of this service to one class of its patrons and to remunerate itself for the use of these facilities through a charge on another which is greater than necessary to cover the cost of the rendition of the services to the latter class. It is found, therefore, that all who receive the benefit of carrying on their business within respondent's stockyard through the purchase and resale of livestock therein should pay for services so rendered substantially one-half the rates and charges imposed upon those who send their livestock to market for sale. The rates herein found to constitute the maximum reasonable rates to be charged by respondent are computed and ascertained upon the basis that respondent will either impose upon all its patrons selling livestock in its stockyards the rates hereinafter prescribed or will content itself to bear the losses occasioned by concession to any class of its patrons. In other words, the reasonable maximum rates hereinafter found are computed upon the assumption that on all livestock sold a second successive time or reweighed in the stockyard for purposes of, or in connection with a resale there will be imposed a service and/or weighing charge substantially one-half of the yardage charge upon the same species and class of livestock when received by rail."

The plaintiff complains that the action of the Secretary in requiring the plaintiff to exact the above-described "service and/or weighing charge" from traders and speculators was beyond the power of the Secretary. The Secretary included the estimated increase of revenue to plaintiff from the traders and speculators charge in his computation of revenues under his schedule, and to that extent the sufficiency of the revenue to compensate the plaintiff is involved.

The Secretary has long been convinced that the practice of the plaintiff in making no "service and/or weighing charge" on account of the facilities and services furnished by it in the traders' division amounts to a discrimination in favor of the traders and against the shippers in general. The Packers and Stockyards Act provides, section 310 (7 USCA § 211):

"Whenever after full hearing * * * the Secretary is of the opinion that any rate, charge, regulation, or practice of a stockyard owner * * * for or in connection with the furnishing of stockyard services, is * * * unreasonable, or discriminatory, the Secretary—

"(a) May determine and prescribe * * * what regulation or practice is or will be just, reasonable, and nondiscriminatory to be thereafter followed."

The majority opinion in the three-judge case in Denver Union Stock Yard Co. v. United States, supra, may reflect that even upon the finding of discriminatory practice which has been made by the Secretary in this case some of the judges might adhere to the opinion that this point made by the plaintiff against the Secretary's order is well taken; but we are of opinion that the Secretary acted within the powers conferred upon him by the statute in considering the evidence that traders and speculators are carrying on extensive operations on petitioner's property and are using petitioner's facilities and services in pursuit of their calling and that, although the plaintiff was at great expense in supplying the facilities, its practice was to make no "service and/or weighing" charge therefor to the traders and speculators. We think the Secretary did not exceed the powers vested in him by the statute when he made the order in question after full hearing and directed that a practice be followed thereafter of exacting a charge as prescribed. The amount of the charge prescribed by the Secretary was arrived at by comparison between the services rendered

shippers, and the method of fixing the rates for services by comparison is not unreasonable, being familiar practice followed by regulatory bodies. Northern Pacific Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1. The charges exacted from the traders and speculators are not shown to be unjust or unreasonable, and the reasons why the rates are not the same as those applicable to shippers but are substantially less were properly addressed to the discretion of the Secretary. The question presented by the action of the Secretary as to "service and/or weighing" charges to traders and speculators is not essentially different from that decided by the three-judge court in Tagg Bros. & Moorhead v. United States (D. C.) 29 F.(2d) 750, 756, where the court said:

"The plaintiffs also claim that the audits of the business of the plaintiff, Tagg Bros. & Moorhead, and the business of R. M. Laverty, show that those concerns would lose money under the Secretary's rates. As to Tagg Bros. & Moorhead, they would, if the condemned excesses in expenses be continued, *and the increased rates allowed by the Secretary be disregarded.* These increased rates apply only to speculators. It appears that the practice has become established for the plaintiffs to charge a certain class of persons, called speculators or yard traders, half the regular commission which shippers generally have to pay for the same service. The Secretary evidently thinks this discrimination improper, and in his schedule he eliminates it, and authorizes the plaintiffs to charge such traders and speculators the same rate that apply to all others. Both the commission men and the speculators are certain that the whole business of buying for resale on the market will quit, to the detriment of the livestock industry, unless the discriminatory rates are continued; but that is prophecy.

"The court has no function where such forecasts of the future clash. Abstractly, speculation appears to be a feature of all open markets everywhere, and might continue at South Omaha, even without discriminatory commission rates in favor of speculators. But the future, and not the courts, must determine. It follows that the showing of probable loss to Tagg Bros. & Moorhead on the hypothesis of half rates to speculators, instead of full rates, as prescribed by the Secretary, is immaterial."

On appeal to the Supreme Court from the decision in that case, 280 U. S. 420, 50 S. Ct. 220, 225, 74 L. Ed. 524, the Supreme Court said: "We find in the evidence before the Secretary ample support for the findings and the conclusion reached by him."

It would seem that if the Secretary did not transcend his authority in the Tagg Bros. & Moorhead Case there would appear to be no basis for the contention that he has done so here.

In its substance the business of the plaintiff is to provide a market place where buyers and sellers of live stock may come together and trade. The stockyard owner, following immemorial practice, exacts its toll from sellers, not from buyers. The function of preventing discrimination imposed upon the Secretary certainly required him to ascertain whether the traders enjoyed discriminatory favor when they sell on the plaintiff's market, and in performing this function he cannot be said to have gone beyond either the letter or the spirit of the statute.

It has been argued that the fact that in the business of the traders legal title to the live stock passes twice is not of controlling importance in the matter of fixing charges for stockyards services, but we think the argument ignores the very object of the existence of the stockyards, which is to provide the place and facilities by means of which buying and selling, that is, changing of title, in live stock may be carried on. Therein lies the justification for charges and, because it is a public service, the power to regulate.

*Test Period.*—Plaintiff complains that the Secretary used too short a period covered by the plaintiff's business in making his tests and computations, but we find the contention to be without merit. The record sufficiently reflects that audits of the company's business were made for the years 1928, 1929, 1930, 1931, 1932, and part of 1933, and this period taken in connection with the evidence covering the general history of the plaintiff appears to have been amply sufficient to justify the Secretary in making his conclusions.

*Accrued Depreciation.*—The plaintiff challenges the Secretary's findings that the percent condition of its structural property, allowing for accrued depreciation, was 84.7. The Secretary considered the testimony of an engineer called by the plaintiff and also

that of an engineer employed by the government and the findings reflect that he fully appreciated the points of difference between them. It is not questioned that both engineers were men of standing in their profession and both follow, in the main, methods that have been approved by the courts. McCardle v. Indianapolis Water Co., 272 U. S. 400, 416, 47 S. Ct. 144, 71 L. Ed. 316; Pacific Gas & Electric Co. v. City and County of San Francisco, 265 U. S. 403, 406, 44 S. Ct. 537, 68 L. Ed. 1075. It is clear that there was substantial testimony to support the finding of the Secretary.

 *Depreciation Reserve.*—The Secretary allowed $200,000 annually for repairs, maintenance, and reserve for depreciation. Mr. Bachmann, accountant, for the government, made a recommendation that the maximum to be allowed for depreciation reserve on a sinking fund basis should not exceed $137,000 to $140,000, based, he said, on Mr. Henrici's computation that straight-line depreciation would exceed $300,000, and subject to adjustment for properties not used and useful. The Secretary found that in the past eighteen years $238,884 had been charged against the depreciation account, or an average of $13,268 per year. The accountant stated that from a study of the company's books it was evident that many items of retirements on property had been charged to the repair account. He also found that the average expenditures for repairs and maintenance approximated $86,-000 per annum. He advised the Secretary to consider both the sinking fund method and the straight line method in arriving at a reasonable figure. Although no adherent of the sinking fund method, he believed in the principle that the facts as to needs for depreciation and the past history of the company should be the guide. He stated that unless the sinking fund method was given consideration an otherwise fair rate of return would become an exhorbitant return. The plaintiff's witness Mr. Hyder found that the stockyard facilities, while simple in the individual nature of the structural units, were of a complex nature as an entirety; some units having a more or less definite life expectancy, the depreciation of which could be computed on the straight line basis, and others (the pens, etc.) having an indefinite life expectancy, since they are maintained in a constant state of good repair. He, therefore, divided the property along these lines and found that the depreciation allowance for the definite life items should be $159,380. He also recommended the addition of $45,000 for extraordinary expense for general obsolescence required for replacements of property having either a definite or indefinite life—a total of $204,380. His position was that to this total should be added an allowance of $86,000 for maintenance and repairs. It is to be noted that Mr. Hyder testified, with respect to the allowance for accrued depreciation to be deducted from the reproduction cost new, that $425,000 would be sufficient to restore the property to 100 per cent. condition. In that connection a high per cent. condition, or, in other words, a small actual depreciation, was desired, but with respect to figuring the allowance for annual depreciation a high allowance is desired to increase the rate base. Both methods of figuring annual depreciation allowance (straight and sinking fund methods) are used; the straight line method finding favor because of its ease of application when the composite life of the structures is easily determinable. United Fuel Gas Co. v. Ry. Comm. (D. C.) 13 F. (2d) 510. The sinking fund method requires the setting aside of a certain sum annually at interest compounded semiannually which will be sufficient to replace the structures at the end of their composite life. The wisdom of the mode of approach adopted by the plaintiff's accountant based on definite and indefinite life expectancies is recognized by the Secretary and indorsed by the court, in Denver Union Stock Yard Co. v. United States, supra. The amount of annual depreciation to be allowed in any case cannot be determined by any fixed and invariable rule. Clark's Ferry Bridge Co. v. Public Service Comm., supra. A right determination depends largely upon the kind of property and the nature of its use, and an estimate of probabilities should be made, based upon the past experience of the utility. 51 Corpus Juris, 25; Bluefield Tel. Co. v. Comm., 102 W. Va. 296, 135 S. E. 833 (1926). And in Public Service Comm. v. United Rys. & Electric Co., 155 Md. 572, 142 A. 870 (1928), it was stated that if an inspection of the equipment shows it to be in a fair condition of repair, and experience and judgment indicate that with reasonable care it should last for a reasonably certain time before becoming worthless, that would certainly seem to be a more reliable guide in determining its annual depreciation than any mode based upon the amount of money it earned. The evidence shows that if a straight line method is followed over $300,-000 would be placed in the depreciation re-

serve annually. Comparing this with the estimate of plaintiff's engineer that only $425,000 would be required to put the property in 100 per cent. condition, it is apparent that such a basis would lead to exhorbitant rates. On the other hand, the evidence shows that an annual allowance of about $137,000 compounded semiannually at 5 per cent. will replace the property at the end of its estimated composite life. Not adopting either of these purely theoretical bases of computation, the Secretary has given weight to both, and based upon the past experience of the company has made a fairly liberal allowance. It is clear that he is not bound to follow either method and is required only to make an allowance liberal enough to enable the company to write off ordinary obsolescence and provide for a sum sufficient to replace the property at the end of its life. The finding of the Secretary, in this matter was not unreasonable or arbitrary.

*Expenses.*—Certain items of expense have been disallowed by the Secretary in his computations relating the income to the property value. The items are comparatively small, and upon analysis of the figures we are satisfied that neither the exclusion nor inclusion of them would control determination of the question as to whether the promulgated rates are confiscatory. Columbus Gas & Fuel Co. v. Pub. Util. Comm. of Ohio, supra. It would seem that if the Secretary should promulgate a rate schedule which was not confiscatory but which if applied would produce fairly compensatory income, the stockyards owner could not proceed to incur expenses by way of donations or the like and so reduce its income below a compensatory amount and then successfully seek injunction.

The matters of most serious question herein are the property valuation and the depreciation reserve, and we think as to both of these controlling questions the testimony offered for the plaintiff tends to defeat its probative force by going too far and proving too much. Plaintiff's testimony is to the effect that its properties are worth some $15,000,000 and its net operating income derived from the rates it had fixed for itself was some $850,000, so that on the showing it would appear to have been voluntarily operating at a rate far below what it asserts to be a confiscatory rate. Likewise, it contends that it must have a reserve for depreciation, maintenance, and repairs far in excess of any reserve which it has ever set up

on its own account. We think the testimony, by proving too much, overshoots the mark and must fail of the intended effect.

In the matter of the charges to be laid upon traders and speculators, the effect of the exercise of the regulatory power cannot be foreseen with exact certainty. The practices that have been found by the Secretary to be discriminatory have been long established and customary not only in the plaintiff's yards but also in those of other stockyards owners with whom the plaintiff is in competition. It is, however, an inescapable incident of any such lawful order of regulation as has been made by the Secretary in this case that after obedience has been given to it justiciable wrongs may develop.

Our conclusion is that the bill should be dismissed without prejudice.

Our findings of fact and conclusions of law are attached to the opinion, together with our decree in due conformity entered as of the same date. Plaintiff's request for findings and conclusions are severally refused and exceptions allowed to each.