**AMERICAN COMMISSION CO. et al. v. UNITED STATES et al.**
No. 10388.

District Court, D. Colorado.
Aug. 29, 1935.

Pershing, Nye, Bosworth & Dick, Robert G. Bosworth, and Arthur C. Johnson, all of Denver, Colo., and John S. Boyd, of Chicago, Ill., for plaintiffs.

C. E. Miles, Dept. of Agriculture, of Washington, D. C., Thomas J. Morrissey, U. S. Atty., of Denver, Colo., G. N. Daggar, Dept. of Agriculture, of Washington, D. C., Wendell Berge, Sp. Asst. to Atty. Gen., Harold M. Stephens, Asst. Atty. Gen., and Seth Thomas, Solicitor, Dept. of Agriculture, of Washington, D. C., for defendants.

Before PHILLIPS and McDERMOTT, Circuit Judges, and SYMES, District Judge.

SYMES, District Judge.

The seventeen petitioners and plaintiffs (individuals, partnerships, corporations) are market agencies buying and selling livestock on commission at the Denver Union Stock Yards, Denver, Colo., and registered and doing business under the provisions of the Packers and Stockyards Act of August 15, 1921 (section 303 [7 USCA § 203]). They filed this bill in equity against the United States and the Secretary of Agriculture, pursuant to section 316 of the act, praying the enjoining, setting aside and annulling of a certain order issued by the Secretary dated September 27, 1934, modified by supplemental order of October 15, 1934. 42 Stat. 168; 7 USCA § 217; 28 USCA § 47.

The bill alleges that on November 20, 1933, the Secretary, under authority of the act, pursuant to an order of notice to the petitioners and others doing business on the Denver market, gave notice of a hearing to determine the lawfulness of any and all rates and charges then in force in the Denver market. Hearings began on March 14, 1934, and were concluded on May 17, 1934.

That on August 27, 1934, before the decision and order of the Secretary, the petitioners, together with the other parties, filed a petition to reopen. On September 27, 1934, the findings of fact, conclusions, and order of the Secretary were duly entered, wherein the Secretary found the schedules of rates and charges then in force unreasonable and unjustly discriminatory, promulgated a new schedule of charges for selling and buying livestock of all kinds on the Denver market, and denied the petition to reopen the case. On October 10, 1934, the petitioners filed with the Secretary a new petition for rehearing, alleging that the effects of the unprecedented drought in the territory contiguous to the Denver market, together with government purchases of drought livestock, had so changed conditions that no fair basis of rates could be formulated by the Secretary without considering that fact, proof of which was offered. This petition was denied on October 15, 1934, and at the same time the effective date of the Secretary's new schedule was postponed until November 6, 1934.

November 6, 1934, a temporary injunction was granted by this, a statutory three-judge court (28 USCA § 47), enjoining the enforcement of the new rates and charges, upon condition that the petitioners deposit monthly with the clerk the full amount by which the rates and charges collected during the preceding month exceeded the rates and charges prescribed in the Secretary's order, together with a verified statement of all persons on whose behalf such amount was collected by petitioners. The matter came on for final hearing on February 13 and 14, 1935, briefs have been filed, and it is now before the court for final disposition.

Briefly, the bill attacks the conclusions and order of the Secretary, charging that they are arbitrary, capricious, and unrea-

sonable, contrary to the evidence, and wholly without support in the record. It recites that the business of petitioners is "one of personal service in its entirety, with very little invested capital," and of a highly competitive nature; that the selling of livestock on commission requires great skill and judgment, the result of long years of experience, etc.; and that the principal items of expense are salaries, principally of the salesmen and other employees. In paragraph 4 thereof it is alleged: "Petitioners respectfully show that said new schedule of rates and charges do not permit and allow to petitioners just and reasonable compensation for their services," etc.

It then charges that the new schedule is based largely on estimates of "reasonable" performance by salesmen, that the volume of sales estimated exceeds the highest record performance of any salesman in the market during the time covered by the inquiry, and that the Secretary did not take into consideration actual expenditures necessarily incurred. The attack then continues on various findings of the Secretary on the ground that they are contrary to the actual experience of petitioners. It is further alleged that the petitioners jointly and severally are deprived of their several properties without due process of law, in contravention of the Fifth Amendment.

The record sustains the Secretary's findings that the services rendered by the petitioners involve mostly personal skill, and to a small extent the use of equipment and capital; that the volume of business handled by any commission firm is dependent on the character of the service rendered, the extent to which it is furnished, and the personal contacts established and maintained with livestock producers generally. It appears that from 1924 to 1935 the amount of business available to petitioners as a whole on the Denver market was fairly constant. For instance, the number of carload equivalents of various species of livestock sold annually by all the firms on the Denver market from 1924 to 1933, inclusive, was between a high of 29,213 and a minimum of 24,765; yet at the same time the division of this business between the petitioners varied greatly. In 1924, for instance, one of the plaintiffs sold 5,342 carloads, another a low of 317 carloads. Another illustration: In 1932 the gross selling and buying revenues received by all

firms amounted to $571,158.14, of which one firm alone received $143,079.45, and another $4,554.50.

Government Exhibit 17 discloses a very wide variation among the different items in the per head cost of selling and buying cattle. For instance, in the year 1933 firm No. 7 sold 18,422 head at a unit cost of .2510, firm No. 13 sold 44,433 head at a unit cost of .1174 per head, and firm No. 16 sold 5,769 head at a unit cost of .1075 per head. The same wide variation is found under another expense item, "Business Getting & Maintaining," a much disputed item. Firm No. 3 sold 98,116 head at a unit cost per head of .1003 for this item, firm No. 10 sold 15,872 head at .1845, while for firm No. 16, selling only 5,769 head .2007. Other illustrations of the same nature are disclosed. Considering that all observe the same schedule of charges and pay the stockyard company the same for handling, feeding, weighing, etc., we conclude these wide variations in amount of business done, costs of identical services, etc., is due to factors of a most intangible kind, peculiar to each firm.

First. Is the order of the Secretary confiscatory?

Confiscation is raised by paragraph 9 of the bill, wherein it is alleged generally that each petitioner in his own behalf says the facts set forth in the preceding paragraphs apply to his business equally, in so far as they relate to his business experience, and that each one conducts his business economically, efficiently, and at reasonable costs, etc. The allegations are made jointly and not severally as to all the petitioners. There are no separate allegations of the situation of any individual plaintiff, nor of facts as to its invested capital, number of employees, or actual or reasonable costs of doing business, which, if true, would establish confiscation. Such allegations standing alone are not sufficient in view of the disclosures of the record already referred to, especially when coupled with the admittedly competitive nature of the business.

To raise the issue of confiscation there should be, for the reasons stated, separate allegations of ultimate facts in respect to each plaintiff. No attempt is made to explain these wide variations among the several firms in the cost of performing the same function. Obviously all cannot be efficient. General averages of the petitioners' outlays that go to make up the total

cost of doing business, based only on actual experience, throw no light on the reasonableness of such charges, the efficiency or waste of any particular firm, nor are they helpful in determining what are fair allowances for a firm conducting its business fairly efficiently.

The Supreme Court has said (Ex parte Poresky, 290 U. S. 30, 54 S. Ct. 3, 78 L. Ed. 152) that the existence of a substantial question of constitutionality must be determined by the allegations of the bill of complaint; (Hall v. Geiger-Jones Co., 242 U. S. 539, at page 548, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643), speaking of the Fourteenth Amendment, that we get no accurate idea of its limitations by the declaration that no person shall be deprived of his life, liberty or property without due process of law, or denied the equal protection of the laws, and 242 U. S. 539, page 548, 37 S. Ct. 217, 220, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643: "A stricter inquiry is necessary, and we must consider what it is of life, liberty, and property that the Constitution protects." And in Spielman Motor Sales Co., Inc. v. Dodge, 295 U. S. 89, 55 S. Ct. 678, 79 L. Ed. 1322, April 29, 1935, that general allegations of irreparable damage, of violation of the due process clause, are not sufficient in the absence of statements of fact sufficient to warrant such conclusions, and according to Dayton-Goose Creek Ry. Co. v. U. S., 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472, the charge of confiscation must be supported by allegations of fact showing the true values for rate-making purposes.

In Tagg Bros. & Moorhead v. U. S., 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524, it was held by the lower court, and affirmed on appeal, that it was not incumbent upon the Secretary to fix rates so high that all agencies in the business would make money, whether they did a substantial business or not. Furthermore, there is no allegation or proof as to the number of firms required to efficiently handle the volume of business offered at the stockyards. The fact is many of the petitioners are not efficiently busy.

The Constitution does not assure the plaintiffs a return upon the aggregate value of their property or services devoted to public use under all circumstances. Failure of the smaller firms, due to competition, to obtain a fair share of the business,

does not require rates sufficient to assure them a living. "The clause of the Constitution here invoked does not protect public utilities against such business hazards." Public Service Comm. of Montana v. Great Northern Utilities Co., 289 U. S. 130, 53 S. Ct. 546, 548, 77 L. Ed. 1080. In Aetna Insurance Co. v. Hyde, 275 U. S. 440, 48 S. Ct. 174, 72 L. Ed. 357, it was held that rates fixed by state authority on the basis of aggregate collections of competing insurance companies, and which afford just compensation to some, but not to others, cannot be attacked by the former under the Fourteenth Amendment upon the ground that they are confiscatory as applied to the latter, and 275 U. S. 440, page 447, 48 S. Ct. 174, 176, 72 L. Ed. 357: "Rates sufficient to yield adequate returns to some may be confiscatory when applied to the business of others. But the latter have no constitutional right to prevent their enforcement against the former. The Fourteenth Amendment does not protect against competition. * * * It has never been and cannot reasonably be held that state-made rates violate the Fourteenth Amendment merely because the aggregate collections are not sufficient to yield a reasonable profit or just compensation to all companies that happen to be engaged in the affected business." In the case at bar, as in the Aetna Case, supra: "Allegations asserting in general language that the findings, order, and reduced rates are confiscatory and repugnant to the Fourteenth Amendment are not sufficient. In order to invoke the constitutional protection, the facts relied on to restrain the enforcement of rates prescribed under the sanction of state law must be specifically set forth, and from them it must clearly appear that the rates would necessarily deny to the plaintiff just compensation and deprive it of its property without due process of law."

No claim is made that the Secretary exceeded his jurisdiction; lack of notice, or a fair hearing. We conclude the issue of confiscation is not properly presented by the bill.

### Scope of the Review.

This conclusion simplifies the issues, and confines our further consideration to a review of the evidence before the Secretary to determine whether it supports his findings, and to a review of those findings to determine if they are supported by any substantial evidence, or are contrary to the evidence. This is in accordance with the

Packers and Stockyards Act August 15, 1921 (chapter 64, §§ 310, 311 [7 USCA §§ 211, 212]), which requires "market agencies" to furnish their services without discrimination and at reasonable rates, and directs the Secretary, after full hearing, to prescribe just, reasonable, and nondiscriminatory rates.

In Denver Union Stock Yard Co. v. U. S. (D. C.) 57 F.(2d) 735, Judge McDermott, speaking for this court, cited the authorities, and discussed at length the scope of the judicial review in cases of this nature, pointing out that where a constitutional question is involved, the court is required to exercise its independent judgment as to both the law and facts, but that where the attack is based only upon the ground that the order rests upon an erroneous rule of law, upon a finding made without evidence, or upon evidence which clearly does not support it, etc., the question must be determined upon the record of the proceedings before the Secretary, and it is not competent for the court to receive additional evidence. Though there is some authority to the contrary, we adhere to that opinion. In prescribing rates for the future, the commission exercises legislative power delegated by Congress. If Congress enacted a statute, after committee hearings, incorporating the rate order now under attack, and if petitioners challenged such statute on the ground of confiscation, the courts would hear such evidence as might be presented on the issue, and exercise an independent judgment, according to the statute the presumption of constitutionality. It is difficult to see why the rate order, promulgated by the Secretary under the authority of Congress, can have a greater immunity from attack than a statute passed by Congress itself. In each instance, petitioners invoke judicial power for the first time when a bill is brought to enjoin the enforcement of the statute or the order as the case may be. If they are denied an opportunity to present their evidence in such case, they are denied a judicial review of a legislative act, which the Supreme Court has repeatedly held is essential to the validity of rate making. In Southern Railway v. Virginia, 290 U. S. 190, 196, 54 S. Ct. 148, 150, 78 L. Ed. 260, the Supreme Court said that the question of the reasonableness of rate orders "is eminently a question for judicial investigation, requiring due process of law for its determination.

If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law, and in violation of the Constitution of the United States."

If the judicial investigation thus held to be essential to a valid rate order can be whittled away by depriving courts of the power to hear pertinent evidence, or to exercise its judgment as to such evidence, Congress may further emasculate the power until there is nothing left of it but the shell. Also see the Ben Avon Borough Case (Ohio Valley Water Co. v. Ben Avon Borough), 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908, and dicta in Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598. In a recent case the Supreme Court has declined the question. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, at page 423, 50 S. Ct. 220, 74 L. Ed. 524. Further, there is a presumption, of course, that the findings of the Secretary are correct.

The petitioners insist that the Secretary is without power to find that existing rates are unreasonable, unless he first determines that there is waste or exorbitant profits in the business as presently conducted, and that his order must rest upon such findings of waste or excessive profits, and go no further than to eliminate the same.

The Secretary refused to be bound by either the lowest cost or by the highest, or by any mere average of actual costs based upon past experience. The proof is that one or more firms as to most, if not all, items of cost under consideration, have performed that particular service within the maximum found by the Secretary to be reasonable.

The Secretary proceeded upon the assumption that plaintiffs should charge no more than the reasonable cost of selling a carload of cattle. This to be arrived at by taking the cost of performing the necessary services incident to the transaction. This he did by finding the aggregate cost of handling the cattle which come to the Denver yard, the number of men reasonably necessary to perform the services, the amount of salaries necessary to pay them, making reasonable allowance for all other proper costs, including management

risk and profit to any firm with sufficient volume of business to function economically. This procedure has been approved by the United States Supreme Court in Tagg Bros. & Moorhead v. U. S., supra, and by three-judge courts in Kansas City, Sioux City, St. Joseph, and Chicago.

In Tagg Bros. & Moorhead v. U. S., supra, the court said, 280 U. S. 420, page 443, 50 S. Ct. 220, 226, 74 L. Ed. 524: "A proceeding under section 316 of the Packers and Stockyards Act is a judicial review, not a trial de novo. The validity of an order of the Secretary, like that of an order of the Interstate Commerce Commission, must be determined upon the record of the proceedings before him—save as there may be an exception of issues presenting claims of constitutional right, a matter which need not be considered or decided now. Louisville & Nashville R. R. Co. v. United States, 245 U. S. 463, 466, 38 S. Ct. 141, 62 L. Ed. 400; compare Liscio v. Campbell (C. C. A.) 34 F.(2d) 646, 647; and see Prendergast v. New York Telephone Co., 262 U. S. 43, 50, 43 S. Ct. 466, 67 L. Ed. 853; and Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 289, 40 S. Ct. 527, 64 L. Ed. 908. On all other issues his findings must be accepted by the court as conclusive, if the evidence before him was legally sufficient to sustain them and there was no irregularity in the proceeding. To allow his findings to be attacked or supported in court by new evidence would substitute the court for the administrative tribunal as the rate-making body. Where it is believed that the Secretary erred in his findings because important evidence was not brought to his attention, the appropriate remedy is to apply for a rehearing before him or to institute new proceedings. He has the power and the duty to modify his order, if new evidence warrants the change. Compare Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U. S. 541, 550, 32 S. Ct. 108, 56 L. Ed. 308. A rate order is not res judicata. Every rate order made may be superseded by another."

In the opinion of the lower court in the same case it is said [Tagg Bros. & Moorhead v. U. S. (D. C.) 29 F.(2d) 750, at page 755]: "Undoubtedly, if rates were fixed so high that certain profits were assured to all regardless, the agencies would multiply much faster than live stock could be brought to the market, and an endless chain of rate increases would be necessary. It is not the purpose of the regulation to bring this about."

## Selling Costs.

The selling of livestock is the most important single function and the largest item of expense in the rate structure. Good salesmen are a result of long training and experience. It is necessary that they be paid a yearly salary, although the intensity of their work varies with the seasonal fluctuations of receipts. Government Exhibit 17, p. 5, already referred to, reveals the wide variation among plaintiffs in the per head salary cost incident to selling and buying cattle and calves. The same is true of the performances per man per day during the peak season. Mondays are the biggest in volume of receipts and sales. Comparable figures of the four leading firms show one firm selling consistently per man 12, 11.75, and 9½ carloads on Mondays, and others as low as 2½, 6, and 5, and the variation could be made wider by including the smaller firms. Manifestly such figures alone, or an average thereof, are of little help in arriving at a reasonable allowance.

The Secretary's finding was a net cost per head for cattle for salesmen of 15 cents, the reasonableness of which is demonstrated by the fact that four of the largest firms over a two-year period sold 63 per cent. of the cattle on this market at a per head cost of less than 15 cents. The Secretary allowed $3,600 a year as a fair salary for a salesman, which is above the average actually paid. During 1932 eight received more than this and 19 less, and for 1933 only five received over this and 17 less. He disregarded sums paid to owners by themselves for their services as salesmen, on the ground that such salary was an arbitrary figure fixed by the profits of the business, or what they cared to charge, and not arrived at by competitive, arm's length bargaining. The Secretary was correct in excluding such salaries. It is undoubtedly true that owner salesmen are highly efficient and entitled to high salaries, yet at the same time, being owners, they devoted some of their time to management which had a bearing on such salaries. The owner is entitled to adequate compensation for management and risk, but this compensation should not be included as a selling cost. The Secretary had made such an allowance in his classification of risk expense and profit. This allowance is in the aggregate, and permits a firm to pay an exceptional salesman

more, and offset the excess against the saving on the smaller salaries paid other employees graduating into the salesman class.

The Secretary found: "In the light of all the circumstances surrounding the selling of cattle and calves, it is reasonable to expect any good salesman to sell as many as 750 carlot equivalents of cattle and calves in the course of a year and sell them well." The record discloses actual individual performances of 25 to 50 cars of cattle sold in the course of a day, but "this could not be done continuously." One salesman testified he had sold 15 cars a day, or more. Another that he might receive 75 to 90 cars, which could be sorted over a Saturday and Sunday, put in condition to be sold Monday, and cleaned up by Wednesday.

One of the salesmen of John Clay & Co.—one of the largest, if not the largest, operator among the plaintiffs—sold 12,298 head of cattle, or 512 cars.

The Secretary agreed with plaintiffs that receipts at this market are more seasonal than other markets for which he has allowed a thousand cars a year as the reasonable performance of a salesman. The largest receipts are in the last third of the year, during which time half the cattle are received. Of 253,000 head of cattle received by rail during the year, 150,000 came these last four months. The receipt of cattle coming in by truck, however, shows very little seasonal variation, and as expressed in carload equivalents that certain firms sold 40 cars a day, and others 60 during the peak months of October and November. Admittedly there is a conflict on this question. Likewise evidence that all the 28 salesmen are employed continuously during the peak season is opposed by testimony that some salesmen equal the Secretary's allowance, and others are not continuously employed at any time.

The Secretary likewise found a salary of $3,000 fair and reasonable for a good hog salesman on the basis of a minimum yearly performance of 50,000 head—a unit cost of six cents per head. The receipt of hogs is reasonably steady throughout the year, and four selling days per week is equal to 200 a year. Hogs average 73 to a car, which makes 685 a year, a reasonable performance, or not over 3½ cars per day as a reasonable sales performance. The record discloses that one man has sold as high as 47 cars in one day, and that several of the firms at least could handle more hogs if they could get them.

The Secretary allowed $3,600 as a fair and reasonable salary for a sheep salesman, on a basis of 900 cars per year, or 1.06 cents per head. Some government exhibits showed sales of sheep as high as 22 carloads per day, and that many of the salesmen selling sheep could handle more if available.

We conclude there is substantial evidence to sustain the Secretary's finding of selling costs.

Business Getting and Maintaining Expense.

For the year 1933 gross commissions of all firms (Government Exhibit 17, p. 9) amounted to $473,063.92, of which $117,-367.81, or 24.8 per cent., was expended under the above heading. For the year 1932 the percentage was 28 per cent. One firm spent 115 per cent. of its commissions for this item, another 45.07 per cent., and so on down to 1.87 per cent., indicating a total lack of control, and at least some waste and inefficiency. As the Secretary observes, it would seem each firm paid what it felt it could afford out of its revenues, governed largely by the intensity of competition, which cannot be expressed in rate cutting.

The Secretary found that 10 per cent. of the total reasonable costs and profit should be covered into rates for "Business Getting and Maintaining," a percentage sustained in the original Tagg Bros. Case, supra, and other decisions.* Counsel for petitioners objected to this, because in arriving at this figure, the Secretary excluded from his résumé certain expenditures charged by plaintiffs to this item. This refers mainly, but not exclusively, to duplication by plaintiffs of market information, prices, etc., more or less helpful to the producers shipping to the Denver market, put out by the Bureau of Agricultural Economics, the Denver Union Stock Yards,

---

*An allowance for this item, like an allowance for going concern value, is peculiarly a matter for the informed judgment of the trier of the facts. Both rest largely upon intangible elements which cannot accurately be measured. In the Denver Stockyards Case (D. C.) 57 F.(2d) 735, 743, 744, counsel now representing petitioner successfully argued to this court that a safe guide for going concern value was the percentage allowed by courts in other cases.

the public press and broadcasting services, etc. Plaintiffs have covered into this heading many other cost items, such as advertising, automobile expense and depreciation, local and miscellaneous entertainment, general soliciting throughout the territory, sorting of livestock before shipment to market, etc.

Several stockmen testified that they did not desire assistance in the sorting and grading of their cattle, and that they favored the complete elimination of any allowance for "Business Getting and Maintaining." At least one livestock organization has passed resolutions requesting that this country solicitation cease, and the resulting savings be used to reduce rates.

In the final analysis the various expenditures considered under this head are incurred mostly to persuade a shipper to send his livestock to one firm rather than another, which presumably can serve him equally well, and not in the development of new territory; so it is hard to see what real benefit it all is to producers and shippers. There is substantial evidence on this record to support the Secretary's finding that 10 per cent. is a reasonable allowance for this item in computing his schedule. We are not permitted to substitute our judgment for his.

### Yarding and Other Costs.

Exhibit A, attached to the brief of respondents; shows a variation of $85.49 between the reasonable costs allowed by the Secretary for yarding, salaries, and expenses, and the actual costs of all firms. The same table shows the allowances made by the Secretary for all items other than "business getting" are in excess of the actual costs of the plaintiffs for the test period. The exhibit is supported by Government Exhibit 17. It is true that all of the yardmen do not devote their time exclusively to yarding, but on occasions do some selling. This obtains as to all classes of employees, who are often switched temporarily to other duties, when not engaged in their own specialty. While this practice may lessen the accuracy of the figures, it is not objectionable, and the resulting errors, if any, offset each other. We see no reason to change the Secretary's findings on this branch of the case.

### Rehearing.

Authority already cited, Tagg Bros. & Moorhead v. U. S., supra, holds that these rate hearings are not res judicata, are always subject to change upon proper showing, and that the Secretary is in duty bound to modify any existing order if new evidence warrants the change. The petition for rehearing, denied by the Secretary, asks the opportunity to present evidence of sweeping economic changes which have occurred since the taking of evidence. This refers to the drought, more or less unprecedented, which has caused considerable depreciation in livestock in the territory tributary to the Denver market, and the government buying program. Other grounds are set forth which are not necessary to notice.

At the time this rehearing was requested, the effect of the drought was largely in the future, a subject of speculation, and its permanent effects undetermined. If temporary they need not be considered. Abnormal conditions are no indication of future trends. The drought and its effects were not nation-wide, and it is reasonable to assume that the shortage of livestock in the Rocky Mountain area will be made up by shipments into it of breeding stock from other parts of the country. If permanent, the resulting decrease in business at the Denver Stockyards would require a reduction in personnel.

It is to be regretted that rate cases of all kinds are necessarily unduly prolonged. Over a year and a half has elapsed since the hearings commenced at Denver. The case must some day be decided if the producers are to have the benefits of the new schedule. As said in U. S. v. Northern Pacific Ry., 288 U. S. 490, 53 S. Ct. 406, 407, 77 L. Ed. 914, referring to the Santa Fe Case (Atchison, T. & S. F. R. Co. v. U. S.), 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273, that decision "is not to be extended to require a rehearing in every rate case for changed economic conditions," etc.

We think the petition was properly denied.

### Conclusion.

The Secretary in his new rate schedule, with the exception of straight car, single ownership, used the per head basis, thus replacing the carload as a unit, which obtained in former tariffs, stating that the change is required by the large increase in truck receipts in comparison with carload receipts at this market over the past few years. His new weight classification, used for the purpose of arriving at a rate schedule for cattle and swine, is justified by the

fact that the weight of an animal has a great deal to do with the price, and is in accordance with the general rule that the rate should bear some relation to the value of the product.

Counsel for plaintiffs argue with great earnestness that the Secretary has used his judgment or discretion to an extent not justified, and has not given sufficient weight to so-called actual costs, based on past experience. We have already given many illustrations from the record that demonstrate that actual costs, or averages thereof, fail to afford a reliable yardstick with which to measure the value of personal services. The wide differences that this record discloses between the volume of business done, earnings, expense of performing identical functions, are due, as we have already pointed out, to personal factors and intense competition; both of which are inherent in the industry, and beyond the control of any rate-making authority. We think the method adopted by the Secretary in carrying out the mandate of the statute is fair and reliable.

Admittedly the 10 per cent. allowance for business getting is based largely on judgment. When we break it down we find it is made up of such nonessential and elusive elements as advertising, entertaining, soliciting, and other items already referred to. A proper determination requires the exercise of judgment. Our attention has not been directed to any authorities, nor do we find any evidence in the record, that justifies the Secretary in loading the full amount of these uncontrolled and arbitrary expenditures on the livestock industry of the Rocky Mountain area. Exhibit B, a comparison of the Secretary's proposed tariff with tariff No. 4, and other evidence, indicate that the proposed reductions he has made are not at all drastic, and even assuming the new rates fail to increase the volume of business, the reductions can be absorbed without loss by the elimination or control of nonessential expenditures.

The Congress has committed to the Secretary of Agriculture, and not to us, the determination of these questions. The record indicates that his findings have been made only after elaborate and fair hearings. His procedure has been approved by this and other courts. When we have determined, as we do, that his findings are supported by substantial evidence, our function is performed. It therefore fol-lows that the bill should be dismissed, with costs, and the temporary injunction dissolved, and it is so ordered.

Counsel will submit suggested findings of fact and conclusions of law agreeable to these views.