### DENVER UNION STOCK YARD CO. v. UNITED STATES et al.

#### No. 10913.

District Court, D. Colorado.
Oct. 8, 1937.

Pershing, Nye, Bosworth & Dick, of Denver, Colo. (Robert G. Bosworth and Norman A. Hutchinson, both of Denver, Colo., of counsel), for plaintiff.

James C. Wilson, Sp. Asst. to Atty. Gen., Robert H. Jackson, Asst. Atty. Gen., Hugh B. Cox and Wendell Berge, Sp. Assts. to Atty. Gen., and C. E. Miles, Atty., Department of Agriculture, of Washington, D. C., and Thomas J. Morrissey, U. S. Atty., of Denver, Colo., for defendants.

Before BRATTON, Circuit Judge, and SYMES and MURRAH, District Judges.

SYMES, District Judge.

The Secretary of Agriculture, pursuant to the so-called Packers and Stockyards Act of 1921, as amended (42 Stat. 159, 7 U.S.C.A. §§ 201-217, inclusive), entered an order February 17, 1937, prescribing maximum reasonable rates and charges to be collected by the plaintiff, the Denver Union Stock Yard Company, for services rendered at its stockyards in Denver. The plaintiff brought this action (authorized by 7 U.S.C.A. § 217, section 316 of the same act) to restrain the enforcement of said order. By agreement of parties an interlocutory injunction was granted by this court on March 9, 1937, enjoining the enforcement of said order pending final hearing.

█ The constitutionality of the act (supra) has been sustained. See Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L. Ed. 735, 23 A.L.R. 229. And section 217 grants us jurisdiction to test the fairness, etc., of an order of the Secretary such as is here involved. It provides that all provisions of law that have to do with the suspension, or restraining the enforcement, operation, or execution of, or the setting aside in whole or in part of the orders of the Interstate Commerce Commission, are made a part of, and applicable to, the so-called Packers and Stockyards Act. See section 24 (27, 28) of the Judicial Code as amended (title 28 U.S.C.A. § 41, subds. 27 and 28).

A previous order of the Secretary prescribing maximum reasonable rates and charges to be collected by the same stock yards company, dated July 28, 1931, was held invalid by this court. Denver Union Stock Yard Co. v. United States (D.C.) 57 F.(2d) 735. The order now before us follows an order of inquiry and notice of hearing, dated November 8, 1934. The taking of evidence by the examiner was concluded July 3, 1935. The oral testimony covers 2,300 pages and 118 exhibits containing 4,000 pages were introduced. It indicates that the Secretary's findings were made only after a full and fair hearing. The procedure has been approved by this and other courts. American Commission Co. v. United States (D.C.) 11 F.Supp. 965.

The Supreme Court has construed the act in question in the St. Joseph Stock Yards Co. Case (St. Joseph Stock Yards Co. v. United States), 298 U.S. 38, at page 51, 56 S.Ct. 720, 725, 80 L.Ed. 1033, and defined the scope and limits of the judicial review permitted, holding that rate fixing

is a legislative act, in the exercise of which there is broad discretion; that the federal courts do not sit as boards of revision to substitute their judgment for that of the Congress or its agents as to matters within the province of either; that when, as in the act in question, the Congress appoints an agent—i. e., the Secretary of Agriculture—to act within the sphere of legislative authority, it may endow the latter with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according the parties a fair hearing and acting upon evidence and not arbitrarily; that "the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority."

The court points out, however, the constitutional limitations on rate-making power that prohibit the deprivation of property without due process of law, or the taking of private property for public use without just compensation, both of which questions are subject to an independent judicial review. See, also, Judge McDermott's discussion in Denver Union Stock Yard Co. v. United States (D.C.) 57 F.(2d) 735.

With this in mind we consider seriatim the particular errors charged by the plaintiff.

█ (1) That the Secretary excluded from the rate base the value of the railroad trackage of the plaintiff, the loading and unloading docks, pens and alleys adjacent thereto, together with the 8.985 acres of land whereon the said facilities are situated.

These facilities are owned by the plaintiff, but leased to the railroads serving the stockyards, under an agreement whereby the railroads pay the plaintiff for the use of the property, cost of maintenance, repairs, and renewals of tracks, and taxes and assessments.

Section 201, 7 U.S.C.A., section 301 of the Packers and Stockyards Act, supra, defines a stockyard service as "services or facilities furnished at a stockyard in connection with the receiving, * * * marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock."

It may be assumed that railroad facilities are indispensable, or at least highly desirable and convenient for the operation of a modern stockyard; for this reason it is claimed that the value of the above property belonging to the stock yard company should be included in the rate base. The Secretary excluded these items, because, according to subsection 5 of section 15 of the Interstate Commerce Act (49 U.S.C.A. § 15(5), the carrier is obligated to deliver livestock at destination free off cars in a suitable place where the consignee can take delivery, all without extra charge, and accordingly held them to be transportation and not yard facilities.

The locomotives and transportation equipment, etc., essential to the performance of this service, are furnished by the several railroads, yet plaintiff claims the right to charge for it. If this is a stockyard service, the inquiry naturally arises, Where does it begin? By a parity of reasoning it could be extended to include the transportation of livestock from the farm or range to the stockyard.

In Covington Stock-yard Co. v. Keith, 139 U.S. 128, 11 S.Ct. 461, 35 L.Ed. 73, it was held that a railroad company is required to provide all facilities for the discharging of livestock after it reaches the place to which it is consigned and that the full performance of this public duty requires the aid of inclosed yards, into which the stock can be safely and effectively delivered. And, furthermore, that a special charge cannot be made in addition to the transportation charge for merely receiving or delivering such stock in and through yards provided for that purpose.

This case was affirmed in United States v. Union Stock Yard Co., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226, which calls attention to the provisions of the Interstate Commerce Commission Act that all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of persons or property and grounds used or necessary in the transportation or delivery of any of said property, are transportation facilities; the test being the character of the service rendered.

In Allied Packers v. Atchison, Topeka & Santa Fe R. Co., 161 I.C.C. 641, at pages 643, 644, the Commission held the unloading of stock into the unloading chutes at a stockyard, even though performed by stockyard employees, to be subject to the jurisdiction of the Commission and that the

assessment of a charge for the use of stock-yard facilities cannot deprive the Commission of its jurisdiction. Likewise in Livestock, Southern Territory, Rates, 171 I.C.C. 721, at page 725, it said: "The law requires carriers to bear the expense of loading and unloading livestock destined to or received at public stockyards * * * whereas practically all other carload freight is loaded and unloaded by the shipper or at his expense." See, also, Atchison T. & S. F. R. Co. v. U. S., 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382.

The fact that the railroads run into the plaintiff's yards and discharge cattle directly into these pens, from where consignees take them, lends no weight to plaintiff's argument. It offers many services to its customers, but it is not, and cannot be, claimed that they thereby become a stockyard facility as defined in section 201, 7 U.S.C.A. (supra); nor does any part of the transportation to and from the plaintiff's plant come within the definition of a "stockyard," which is a public market, "Consisting of pens, or other inclosures, and their appurtenances, in which live cattle, sheep, swine, horses, mules, or goats are received, held, *or* kept for sale or shipment in commerce." Section 202, tit. 7, U.S.C.A.

■ Furthermore, there is no escape from the proposition that the transportation the shipper pays for includes what the statute says it must—the delivery at public stockyards into suitable pens. That service is covered by the rate paid to the railroad, and to permit the plaintiff to charge for it would constitute a double impost. The railroads pay the plaintiff for loading and unloading livestock, which they would hardly do were it a stockyards service, and we take notice that the Commission includes in the rate base of railroad tracks and lands leased and used and useful in the transportation service. Livestock Loaded and Unloaded at Chicago, 213 I.C.C. 330.

We think the Secretary is correct in this matter.

■ (2) That the exclusion of the so-called stock show property, consisting of the stadium, sales pavilion, etc., from the rate base is arbitrary, contrary to the law and the evidence, and confiscatory. ·

These structures and the 2,633 acres of land upon which they are situated are leased to and operated by a separate corporation which holds an annual livestock show. The expenses of the show are borne in part by public subscription and the Stockyards Company pays the taxes. At the annual show held in January large quantities of purebred livestock are received, sold, and handled at the yards by reason thereof. The facilities offered are no more than needed for the purpose.

There is considerable evidence that the show is a benefit to the industry as a whole, as distinguished from the Denver yards in particular, and tends to improve herds and to advertise Denver as a good cattle market.

The government, admitting that some livestock may be attracted to the Denver yards by the show, says it would all filter through this market at other times and does not increase the total income of the plaintiff. Attention is also called to the fact that the show lasts for a week only and the lessee, the Western Stock Show Association, does not pretend to furnish any stockyard facilities. But, even if it is a stock show facility, it is not available to patrons during the remaining 51 weeks of the year, and a very small proportion of the livestock handled uses these buildings even during the week of the show. Were we charged with the determination of this factual question, we might, because of the indirect benefits to the industry as a whole resulting from the stock show, feel the question to be a debatable one. But there is substantial evidence pro and con on this issue; hence we are not justified in overruling the Secretary, especially where, as in this instance, a stock show is not an indispensable facility and its exclusion does not affect the value of the property as an integrated and established enterprise. Los Angeles Gas Corporation v. Railroad Comm., 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180.

(3) That the Secretary erred in not including in plaintiff's rate base an allowance of not less than $325,000 for going concern value of plaintiff's business and property and that his findings to this extent are arbitrary, contrary to the law and the evidence, and confiscatory.

The Secretary recognized that the respondent stockyard was a going concern, with a long history of efficient and economical management and financial success. Likewise he calls attention to the fact that it has never defaulted on its bonds and has paid dividends on the preferred stock continuously since 1917 and on the common stock since 1913, with the exception of three years.

█ No separate allowance for going concern value was made by the Secretary, nor is one necessary provided it is included in valuing the property upon which the owner has a right to a fair return. Des Moines Gas Co. v. Des Moines, 238 U.S. 153, 35 S.Ct. 811, 59 L.Ed. 1244.

█ The Los Angeles Gas Corporation Case, supra, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180, is the latest expression of the Supreme Court on this valuation item. Beginning at page 313 of 289 U.S., at page 647 of 53 S.Ct., the court affirms the Des Moines Gas Company Case, supra, and makes a distinction between so-called "good-will" and going concern value, saying good will is an " 'element of value which inheres in the fixed and favorable consideration of customers, arising from an established and well-known and well-conducted business,' " which, "as the court has repeatedly said, is not to be considered in determining whether rates fixed for public service corporations are confiscatory."

Nor are past losses or profits to be considered.

The opinion codifies the authorities on this subject, saying: That it is the appropriate task of the Commission to determine the value of the property affected by the rates it fixes, as that of an integrated operating enterprise, and it is the function of the court, in deciding whether rates are confiscatory, not to lay down a formula, much less to prescribe an arbitrary allowance, but to examine the result of the legislative action in order to determine whether its total effect is to deny to the owner of the property a fair return for its use. And referring to the Cedar Rapids Gas Company Case (Cedar Rapids Gas Light Co. v. Cedar Rapids), 223 U.S. 655, 32 S.Ct. 389, 390, 56 L.Ed. 594, the opinion says the fact "that the plant was in successful operation" had expressly been taken into account and a value fixed, which "considerably exceeded its cost," and hence the court found no warrant for changing the result. And finally that the inquiry must be whether the evidence requires the conclusion that by reason of the inadequacy of the valuation the result is confiscation.

See, also, Lincoln Gas Co. v. Lincoln, 250 U.S. 256, 39 S.Ct. 454, 63 L.Ed. 968, where, after questioning the propriety of the master's treatment of going value, but noting compensatory errors in favor of the complainant, the court said it could not conclude that the master was wrong in holding that the ordinance was not shown to be confiscatory.

█ The government's case on valuation is made principally by the witness Zelinski, an employee of the department and charged with that work since 1934. His qualifications are recited at length in the record, and include similar duties performed in other stockyard cases. His valuation is based upon material in place and upon a property able and willing to function as a stockyard and a business earning an income. As to particular details: He allowed interest during construction on the structural property, considered such items as proximity to highways, railroads, freedom from floods, access to water supply and other city services, its favorable location in regard to related industries, the effect of the city zoning ordinance, and that the highest and best use of the particular area in question is for stockyards. He likewise testified that he valued it higher because of its availability for a stockyard and as an assembled tract as distinguished from the several tracts in separate ownership. He also included construction overhead, general overhead, and added 5 per cent. in addition for omissions and contingencies, omitting, however, organization expenses. He gave consideration to the peculiar climatic conditions of Denver as affecting rot, rust, and decay. The Secretary added to Mr. Zelinski's figures $30,267 to cover one year's interest on the used and useful land during the construction period and added $139,300 for working capital. In conclusion the Secretary arrived at $2,792,700 as the rate base upon which the respondent is entitled to earn a fair return.

We think the record does not support the respondent's contention that Mr. Zelinski valued the land as naked land, merely because he says he considered it "stripped of all improvements." He, like the respondent's experts, used several tests of valuation, such as previous sales, assessed valuation, and the other formulas. His staff listed every bit of structural property, even down to the number of two by fours in the pens, squares of paving, etc. An honest attempt was made to determine labor, material, and business costs as of the date of the inventory, January 1, 1935, which was checked against a wealth of cost and price data maintained by the Department at its Kansas City office. Nor were such items as engineer and architect's fees, one year's taxes, legal fees, general sala-

ries, expense during construction overlooked.

█ It is apparent from Mr. Hyder's interesting dissertation on going concern value that, unconsciously perhaps as plaintiff's expert, he included certain intangible elements that we may not consider, such, for instance, as good will, etc. He allowed $350,000, as a minimum going concern value, computing it at $10.00 per car for an admitted yearly average of 35,000 cars of livestock. A formula of this nature has no support in the record. He says it is similar in principle to one used occasionally for measuring the going concern or goodwill value of an established business for the purposes of sale. When applied to the situation here presented, we think it arbitrary and condemned by the Los Angeles Case, supra.

█ The authorities do not justify the inclusion in the rate base the cost of land donated by the plaintiff to packing plants and railroad companies for so-called development of business, the cost of which, with carrying charges to the date of the hearing, is over $325,000. The benefits, if any, of such largesse are speculative and have not been identified. Nor are they part of that element of value that pertains to an assembled and established plant doing business and earning money as defined in the Des Moines Gas Company Case, supra, 238 U.S. 153, 35 S.Ct. 811, 59 L.Ed. 1244. The well-deserved success that plaintiff has enjoyed is not the result of such artificial stimuli, but rather to efficient management and financing and the advantages that Denver and the surrounding territory offer to an enterprise of this kind.

Had the Secretary seen fit to value going concern value as a separate item, it would have been more accurate and simplified our task. A careful examination of the record, however, discloses that it was fully considered and that the figure the Secretary finds the respondent is entitled to earn a fair return on is larger as a result thereof. The plaintiff has not made the convincing showing of error required by the St. Joseph Case, 298 U.S. 38, at page 53, 56 S.Ct. 720, 726, 80 L.Ed. 1033.

(4) The plaintiff charges that the Secretary's findings on value of plaintiff's land are unlawful, in that the finding of $536,825 for used and useful land is not supported by substantial evidence and is therefore arbitrary and confiscatory.

The Secretary adopted the land valuations of his own witness Zelinski, who valued all the plaintiff's lands at $724,924, whereas the witnesses for the company—Messrs. Eppich, Newcomb and Ivins—arrived at $1,645,552 for the same property.

█ In their brief counsel for plaintiff concede the experts on both sides are well qualified and argue that this large discrepancy in their figures must be upon the basis of difference in qualifications or in method pursued. Also that the method followed by their board of appraisal and the elements of value considered are identical with those of the government witness Zelinski. The argument is grounded on the alleged lack of experience of the government witness. Zelinski's previous lack of familiarity with land valuations in and about Denver is as immaterial to this discussion as is the fact that the three experts on the other side never valued any other stockyards before, either in Denver or elsewhere. It is apparent that the company's three experts took into consideration the so-called "stockyards value" of the property, instead of the fair average market value of similar land without considering the anticipated use. This is contrary to the rule in the Minnesota Rate Cases, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A. (N.S.) 1151, Ann.Cas.1916A, 18. Mr. Zelinski's experience and qualifications as a land appraiser and the methods pursued in this matter are detailed in the record and lead us to the same conclusion in respect thereto as the court came to in Union Stock Yards Co. of Omaha v. U. S. (D.C.) 9 F.Supp. 864. He was also accepted as an expert in St. Joseph Stock Yards Co. v. U. S. (D.C.) 11 F.Supp. 322. Our experience in valuation cases might justify us in taking judicial notice of the tendency of local appraisers to give a higher value to lands than others. The most we can say is that the Secretary adopted the lowest valuation of a qualified expert. As it was within his discretion so to do, we cannot interfere.

Likewise the discussion of the valuation of structures is simplified by the plaintiff's admission that Mr. Zelinski followed the same methods as their experts, and the statement of Mr. Hyder that the inventory upon which the cost of reproduction new is fixed and the resulting figures developing total cost of reproduction new as established by Mr. Zelinski was substantially correct and that the variations from

his figures are no more than would be anticipated from equally competent engineers.

(5) That the order of the Secretary requires the plaintiff to charge and collect from yard traders a rate of one-half the specified yardage charge on cattle, calves and hogs, slightly less than one-half on sheep and goats, and the full charge on horses, mules and pure-bred bulls.

The petitioner asserts this is arbitrary and unsupported by the evidence, an invasion of the function of management, and therefore confiscatory and void.

The Secretary's action is based upon the finding that the failure to assess a proper charge against yard traders is a discriminatory practice forbidden by the act and, unless such charge is made, the balance of the rate schedule will not produce the return to which the stock yard company is entitled.

The Secretary finds that livestock purchased and disposed of by yard traders occupies a considerable portion of respondent's yards—approximately 160 pens—together with adjacent alleys. It is undisputed that under present conditions trader livestock makes no contribution to the support of the yards, other than the profit it may pay on the hay and grain purchased. The Secretary in his five-year recapitulation of the volume of business 1930-34, inclusive, shows that 55,405 head of cattle out of a total of 367,822 were sold and reweighed for the purposes of sale. And that during this five-year period yardage was paid on 89 per cent. of cattle arrivals and 82 per cent. of calf arrivals. Manifestly livestock using the yards but not paying therefor casts a burden upon those that do pay, irrespective of the reason. Yard traders purchase livestock—mostly cattle—from commission men and either sell in this market or reship to other outlets. On stock shipped away from this market they pay no yardage, the charges under discussion being applicable only to stock sold here. So under the practice that now obtains a considerable part of the stockyards property is used, maintained, and numerous expenses incurred in rendering free service to this class of patrons. Necessarily the charge to the other patrons must be that much greater if plaintiff is to earn a reasonable return. The present income of the stock yards company represents, almost entirely, commissions upon sales at the yards paid by shippers; that is to say, by ranchers and farmers scattered throughout the West who use the yards only occasionally. They have an investment in a ranch or in a herd, while the yard trader has no capital investment, as he makes free use of the respondent's plant for and as his place of business.

Respondent's own witnesses testified that the producer, that is, the shipper, has paid for this service in the marketing charge assessed against him by the stock yard company. It follows, therefore, that this is a discriminatory practice and results in the yard trader getting for nothing a service that all other patrons of the yard pay for. And to say that this discrimination is justified because the trader is a desirable part of the market machinery, helps maintain prices, and brings about a prompt absorption of offerings on the market, is no reason why he should not pay his proportionate share of the cost of conducting the market.

Public utilities should occupy a disinterested position, charging all alike for the same service. A similar charge was upheld in the Omaha and St. Joseph Stock Yards Cases (Union Stock Yards Co. of Omaha, supra, 9 F.Supp. 864, at pages 879–881, and St. Joseph Stock Yards Co. v. U. S., 298 U.S. 38, at page 70, 56 S.Ct. 720, 733, 80 L.Ed. 1033). In the Omaha Case the court declined to follow the opinion in Denver Union Stock Yard Co. v. U. S., supra, on this question.

(6) The scope of the judicial review in this case.

Under this heading we can dispose of the remaining questions. Plaintiff, in support of its several objections to the Secretary's order, charges, generally, confiscation, the deprivation of its property without due process of law; that the decision of the Secretary is not conclusive, and the court must determine the issues upon its own independent judgment, both as to the law and the facts.

It is axiomatic of course that due process means the Secretary's finding must be based upon substantial evidence. He must not act arbitrarily and the respondent must have a fair hearing. To properly raise constitutional objections, however, it is not sufficient to plead them simply as legal conclusions. The facts pleaded in the bill must disclose a serious question of unconstitutionality. Ex parte Poresky, 290 U. S. 30, 54 S.Ct. 3, 78 L.Ed. 152.

■ Spielman Motor Co. v. Dodge, District Attorney, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322, holds that general allegations of irreparable damage, due process of law, etc., are not sufficient in the absence of a statement of facts sufficient to warrant such conclusion. One relying upon the Fourteenth Amendment must point out specifically what specific right of property is affected and why its use and enjoyment may not be regulated. Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A.1917F, 514, Ann.Cas. 1917C, 643. And "Suitors may not resort to a court of equity to restrain a threatened act merely because it is illegal or transcends constitutional powers. They must show that the act complained of will inflict upon them some irreparable injury." United Gas Co. v. Railroad Comm., 278 U.S. 300, 49 S.Ct. 150, 152, 73 L.Ed. 390. See, also, American Commission Co. v. United States, supra, 11 F.Supp. 965, at page 968, and cases cited.

■ Likewise we must bear in mind the statement in Northern Pac. Ry. Co. v. North Dakota, 236 U.S. 585, at page 598, 35 S.Ct. 429, 434, 59 L.Ed. 735, L.R.A. 1917F, 1148, Ann.Cas.1916A, 1, that: "The legislature undoubtedly has a wide range of discretion in the exercise of the power to prescribe reasonable charges"; and page 599 of 236 U.S., page 434 of 35 S. Ct.: "Nor is its authority hampered by the necessity of establishing such minute distinctions that the effective exercise of the rate-making power becomes impossible."

This, together with the rule of the Los Angeles Gas Case, 289 U.S. 287, at page 305, 53 S.Ct. 637, 643, 77 L.Ed. 1180, heretofore stated and this language of that case, that "The judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory," forces the conclusion that we may not interfere with the order of the Secretary unless we are convinced that the valuation and rates prescribed as a whole result in an inadequate return.

■ We cannot take seriously the plaintiff's allegation that its property has been confiscated simply because the Secretary eliminated from the expense account "dues, donations and subscriptions" that during the past five years averaged from three to four thousand dollars a year, and limited this item to $300 a year, the amount of the contributions thought to be actually beneficial to the stock yard company employees and patrons.

■ Next, having found the fair value of plaintiff's property used and useful in rendering stockyard's services to be $2,792,-681, the Secretary determined that a return of 6½ per cent. upon that amount to be reasonable. This rate has been upheld in Dayton Power & Light Co. v. Public Utilities Comm. of Ohio, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267, and Los Angeles Gas Case, supra, 289 U.S. 287, at page 319, 53 S.Ct. 637, 649, 77 L.Ed. 1180. The Secretary's findings on this point were based upon the evidence of an experienced investigator, Dr. Dozier.

■ Dr. Dozier has testified in a great many rate cases before the Department as an expert on the rate of return, and his exhaustive studies on this question are to be found in Government Exhibit 45. The plaintiff's only witness was Mr. Arthur Bosworth, a local investment banker of high standing, and a stockholder and member of petitioner's board of directors. We take judicial notice that the plaintiff enjoys a monopoly with no prospect of competition. Also we may note the fall in the rate of return on conservative investments over the past five or six years. Atchison, Topeka & Santa Fe Ry. Co. v. U. S., 284 U.S. 248, at page 260, 52 S.Ct. 146, 149, 76 L.Ed. 273.

The Supreme Court in Tagg Bros. & Moorhead v. U. S., 280 U.S. 420, at page 443, 50 S.Ct. 220, 226, 74 L.Ed. 524, said: "A proceeding under section 316 of the Packers and Stockyards Act [7 U.S.C.A. § 217] is a judicial review, not a trial de novo. The validity of an order of the Secretary * * * must be determined upon the record of the proceedings before him— save as there may be an exception of issues presenting claims of constitutional right."

■ A careful review of the record convinces us that the Secretary has not exceeded his discretion; that each finding is well within the limits established by substantial evidence. So it necessarily follows that the order inflicts no irreparable injury. The plaintiff had a full hearing before the Secretary and this court as well. As stated in the previous case, Denver Union Stock Yard Co. v. U. S., supra, 57 F.(2d) 735, 739, the legal presumption that the findings of the Secretary are correct "is strengthened in this case by the fact that the report of the Secretary bears internal evidence of

the careful investigation made by him, and his disposition to be fair."

The same question is involved in these two cases and have been litigated for over seven years. Being of the opinion that the Secretary's order is valid, we see no reason for further delay in its enforcement. It may of course, upon good cause being shown, be modified by the Secretary.

It follows that the bill should be dismissed and defendant have its costs.